Argued and submitted September 29, 2008, convictions on Counts 1, 3, 4, 5, 6, and 11 reversed; remanded for further proceedings and resentencing; otherwise affirmed May 20, 2009

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# DYLAN TYE PAOLONE,
*Defendant-Appellant.*

Lincoln County Circuit Court
055376; A132904

209 P3d 324

David O. Ferry, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Rolf C. Moan, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Brewer, Chief Judge, and Riggs, Senior Judge.

BREWER, C. J.

## BREWER, C. J.

Defendant appeals a number of convictions that arose out of his invasion of a home in order to assault a person who was visiting the occupants.[1] In the process, a codefendant stole property that belonged to the home's occupants. We write only to address the assignments of error that are related to the trial court's admission of evidence of the codefendant's statements to a police officer after the codefendant's arrest; we reject defendant's other assignments of error without discussion. We reverse and remand those convictions that are related to the theft of property and affirm those that are related to the assault.

Because of the jury's guilty verdicts, we state the facts in the light most favorable to the state, except when we evaluate whether the erroneous admission of evidence was harmless; for the latter purpose, we "review all pertinent portions of the record, not just those portions most favorable to the state." *State v. Maiden*, 222 Or App 9, 11, 191 P3d 803 (2008), *rev den*, 345 Or 618 (2009). Smith, one of defendant's codefendants, believed that Maschka, one of the victims, had stolen Smith's wallet, which contained a substantial amount of money. Smith offered to pay defendant and another codefendant, McDonough, to beat up Maschka in retaliation for the supposed theft. McDonough and defendant agreed to assault Maschka but declined a direct payment. Smith drove defendant and McDonough toward Maschka's former residence. On the way, Smith drove by the house of Miller and Grimes, who were friends of both Smith and Maschka. Smith had been to the Miller and Grimes's residence many times and knew that Grimes had recently received an inheritance of $10,000, that Miller and Grimes kept their most valuable possessions in an attic above their bedroom, and that the attic was reached by a set of stairs that pulled down from the ceiling in the bedroom. Maschka had previously lived in the

---

[1] Specifically, defendant was convicted of first-degree robbery (ORS 164.415) and conspiracy to commit first-degree robbery (ORS 161.450); first-degree burglary (ORS 164.225) and conspiracy to commit first-degree burglary; second-degree robbery (ORS 164.405) and conspiracy to commit second-degree robbery; third-degree assault (ORS 163.165); unlawful use of a weapon (ORS 166.220); felon in possession of a firearm (ORS 166.270); second-degree theft (ORS 164.045); and fourth-degree assault (ORS 163.160).

attic room for a short time. Neither McDonough nor defendant knew Miller or Grimes, or had previously been in their home.

When he went by the house where Miller and Grimes lived, Smith saw Maschka's car parked in front. He therefore let McDonough and defendant out of the car and told them to call him when they were through assaulting Maschka. The assault, however, did not go as McDonough and defendant had expected. The two went to the front door and walked into the living room without knocking. They identified Maschka, asked him whether he thought it was funny to take people's money, and punched him.[2] At the same time, they saw that Miller's and Grimes's two young daughters were in the room. McDonough pushed Grimes and the children into the children's bedroom. Grimes and the children then left through an outside door in that room and ran to a neighbor's house to call the police. At about the same time, and before McDonough and defendant could complete their assault of Maschka, Miller attacked defendant, and the two grappled for a time. Defendant pulled Miller's sweatshirt over his face so he could not see. While they were tussling, Maschka escaped out the front door. Defendant had brought a .22 caliber pistol with him, and during the struggle, the pistol fired.[3] Defendant then called McDonough for help. Together, they broke free from Miller, hit him sufficiently to bruise him, and left.

After McDonough had sent Grimes and the children to the children's bedroom, and while Miller and defendant were grappling, McDonough went into Miller's and Grimes's bedroom and up the pull-down stairs into the attic, which he ransacked. From the attic, he took an electric guitar, the small case in which Grimes previously had kept the money from her inheritance,[4] and several marijuana pipes from Miller's collection. McDonough carried those things with him

---

[2] It is not clear whether McDonough or defendant did some or all of these things; that uncertainty does not affect our analysis.

[3] Defendant denied bringing the pistol with him, testifying that Maschka had it when defendant entered the house. The jury by its verdict rejected that portion of defendant's story.

[4] The money was no longer in the case when McDonough took it.

when he and defendant left the house. The entire episode took approximately five minutes. McDonough and defendant then called Smith, who picked them up in his van. A few minutes later, police stopped the van both for a traffic violation and because they suspected that it was connected to the events at the home of Miller and Grimes. When the van was stopped, defendant's coat was covering the guitar case. After Grimes identified McDonough and defendant, police officers arrested all three occupants of the van.

While McDonough was in custody, he made a number of statements to Officer Eskridge that the court admitted into evidence over defendant's objection. Those statements were (1) that defendant told McDonough to go upstairs and get the guitar and told him where to look for the stairs; (2) that defendant told McDonough that, "We gotta get goin' " at the end of the episode; (3) that defendant threw flex cuffs[5] and duct tape at McDonough and told him to put them in his pack; (4) that defendant asked Maschka, "Where's my money?"; (5) that defendant took a camouflage bag out of his coat or vest and told McDonough to pack it up; and (6) that, while they were in Smith's van after the episode but before the police stopped them, defendant handed McDonough the pistol and told him to get rid of it. The admission of those statements is the basis for defendant's first six assignments of error. In order to evaluate those assignments, we must first describe the crimes for which defendant was convicted.

Defendant was indicted on a number of charges, some of which are related to the theft of property and some of which are related to the assault on Maschka. He was tried jointly with Smith and McDonough. The jury found defendant guilty of the following offenses related to the theft: first-degree robbery; first-degree burglary by unlawfully entering a dwelling with the intent to commit theft in it; conspiracy to commit first-degree burglary with the same intent; second-degree robbery; conspiracy to commit second-degree robbery; and theft in the second degree. The jury found defendant guilty of the following offenses related to the assault: third-degree assault; unlawful use of a weapon; felon in possession

---

[5] Flex cuffs are plastic handcuffs that the police use when, for one reason or another, standard metal handcuffs are unsuitable or unavailable.

of a firearm; and fourth-degree assault as a lesser-included offense of the charge of second-degree assault. As the state correctly points out, and as defendant concedes, defendant's arguments regarding the admission of McDonough's statements apply only to the charges that are related to the theft, not to those related to the assault.

■ Defendant argues that McDonough's statements are inadmissible hearsay under the Oregon Evidence Code and that they violate his rights to confrontation under both the state and federal constitutions. He recognizes that the hearsay and state constitutional analyses are the same, because the hearsay exceptions involved are firmly rooted. *See State v. Cook*, 340 Or 530, 540, 135 P3d 260 (2006) (if a statement falls within a firmly rooted hearsay exception, its admission does not violate Article I, section 11, of the Oregon Constitution). His federal constitutional argument is based on the Sixth Amendment to the United States Constitution as the United States Supreme Court construed it in *Crawford v. Washington*, 541 US 36, 124 S Ct 1354, 158 L Ed 2d 177 (2004). Under *Crawford*, an out-of-court testimonial statement by another person is inadmissible against a defendant unless the declarant is available for cross-examination at trial. Testimonial statements include those given during police interrogations. Although both defendant and Smith testified, McDonough exercised his constitutional right not to testify at the trial and thus was unavailable for cross-examination.

■ The state argues that the admission of McDonough's out-of-court statements did not violate either the Oregon Evidence Code or Article I, section 11, of the Oregon Constitution. It concedes, however, that, under *Crawford*, the admission of those statements violated the Sixth Amendment. Nevertheless, it argues that the error was harmless because the jury would have convicted defendant based on other, properly admitted, evidence in the record. In order to succeed in that argument the state must show beyond a reasonable doubt that the error did not contribute to the jury's verdict. *See Chapman v. California*, 386 US 18, 24, 87 S Ct 824, 17 L Ed 2d 705 (1967) (federal constitutional error must be harmless beyond a reasonable doubt to support affirmance on appeal).

We would normally consider defendant's state evidentiary and constitutional arguments first. However, as the state recognizes, there is no question that admitting the challenged evidence violated the Sixth Amendment, and the federal constitution harmless error standard—that the error must be harmless beyond a reasonable doubt—is at least as demanding as the state standard. *See State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) (discussing state harmless error standard); *State v. Vargas-Samado*, 223 Or App 15, 19, 195 P3d 464 (2008) (same). For those reasons, we will first determine whether the admission of the evidence was harmless under the standard established in *Chapman*. *See State v. Miles*, 208 Or App 252, 255, 145 P3d 242 (2006) (employing similar approach).

The state argues that the admission of the statements—including the statements that defendant told McDonough to go get the guitar, told him where to look for the stairs, and gave McDonough a camouflage bag and told him to fill it up—was harmless in light of other evidence in the record that demonstrated that McDonough and defendant participated with Smith in a conspiracy to steal from Miller and Grimes and that McDonough's actions in going to the attic and taking their property were designed to further that conspiracy. The state points to evidence that Smith was familiar with the house, knew how to get into the attic, and knew that the attic contained valuable property. According to Grimes, Smith knew where she kept the money from her inheritance and had seen it. He also knew about Miller's collection of marijuana pipes, which was in plain view in the attic, and that Grimes had recently given Miller a valuable guitar.

The state further points to evidence that, in the short time that McDonough and defendant were in the house, McDonough went to the attic, that it was the only room that he searched, and that he took what were potentially the most valuable items in it, which were also the only ones that Smith had reason to believe would be there. Thus, according to the state, McDonough must have acted on a plan that all three defendants formulated before entering the house, and Smith must have provided the information for that plan. Smith, McDonough, and defendant were together when the plan

must have been formulated, so—the state argues—defendant must have been a participant in it:

> "The evidence thus demonstrates that defendant was with Smith and McDonough when they presumably formulated their conspiracy. Put differently, nothing in the record suggests that any planning involved *only* Smith and McDonough, or suggests that defendant was absent whenever the conspiracy at issue was articulated, or whenever Smith decided to share information about valuable property inside the victims' home."

(Emphasis in original.)

Thus, according to the state, McDonough's and defendant's actions in the home showed that they acted in concert to carry out the conspiracy, which included both the assault on Maschka and the property crimes. Defendant temporarily gained control over Miller in their struggle by pulling Miller's sweatshirt over his face, giving McDonough the opportunity to go upstairs into the attic. Before McDonough did so, either he or defendant asked Miller where his money was, which indicated that they knew that he had money. When McDonough and defendant left the house, they carried the guitar case; when the police stopped Smith's van, defendant's coat was covering the case. All of those things, according to the state, can lead only to the finding that the purposes for the entry into Miller's and Grimes's home included stealing the items that McDonough, in fact, took.

The problem with the state's argument is that it does not consider countervailing inferences available from that same evidence or other, countervailing evidence. Thus, the state infers from McDonough's theft of property that Smith and McDonough had formed a conspiracy for McDonough to commit that conduct before they went to Miller's and Grimes's house. It then infers that defendant was part of that conspiracy because nothing in the record suggests that their planning involved only Smith and McDonough or that defendant was absent at the time that they made their presumed plans. In the absence of McDonough's inadmissible statements, those inferences rely primarily on evidence that McDonough went straight to the attic and brought down the

most valuable items and that either McDonough or defendant asked Miller where his money was.

However, the evidence on which the state relies, in conjunction with other evidence in the record, could support different inferences from those that the state suggests. That evidence could support the inference that, rather than acting in accordance with a previous plan, McDonough acted on his own in going to the attic. While defendant grappled with Miller, McDonough rushed Grimes and the children out of the room for their protection. From the door to the children's bedroom McDonough could have seen the bedroom below the attic. If the stairs to the attic were down, he could also have seen that fact; if they were not, he could have seen where the stairs were and could have pulled them down himself. McDonough's decision to go up the stairs could have been his own. Although it is permissible to infer that the purpose for defendant's struggle with Miller was to give McDonough time to search the attic, it also possible that defendant was simply trying to free himself from an attack that he had not expected. McDonough's visit to the attic was short. He returned with his acquisitions about the time that the gun fired and he then helped defendant get free. At that point, defendant, recognizing that if Miller shot him it could be a justifiable shooting,[6] decided that they had to get out immediately. McDonough and defendant therefore hit Miller to slow his pursuit and fled with the property that McDonough had acquired.

In short, although there is much to support the state's explanation for those actions, it is not the only possible explanation. Miller's testimony that McDonough and defendant asked about his money, rather than the money that Maschka supposedly took from Smith, and that they attempted to control him by pulling his sweatshirt over his head, suggests that McDonough and defendant were interested in things in the house in addition to Smith's wallet. The very fact that McDonough went directly to the place where, as Smith knew, Miller and Grimes kept their most valuable

---

[6] Defendant testified that he had previously killed a man who drew a gun on him and that it was ruled a justifiable homicide.

property strongly suggests that he did so pursuant to a previous plan. The strongest direct evidence in support of the state's theory, however, comes from McDonough's erroneously admitted out-of-court statements. For defendant to tell McDonough to go up the stairs and get the guitar and tell him how to do so, and for defendant to give McDonough a camouflage bag to put the property in, tends to remove any ambiguity from the other evidence. If the jury believed McDonough's statements, a conviction on the property-related charges was highly likely.

For all of those reasons, we cannot say beyond a reasonable doubt that the erroneously admitted evidence was harmless. We therefore reverse the property-related convictions[7] and remand the case for further proceedings and, ultimately, resentencing. *See* ORS 138.222(5)(b); *State v. Muyingo*, 225 Or App 156, 161-66, 200 P3d 601, *adh'd to on recons*, 226 Or App 327, 203 P3d 365 (2009) (discussing remand of entire case for resentencing); *State v. Rodvelt*, 187 Or App 128, 66 P3d 577, *rev den*, 336 Or 17 (2003) (same).

Convictions on Counts 1, 3, 4, 5, 6, and 11 reversed; remanded for further proceedings and resentencing; otherwise affirmed.

---

[7] The trial court merged the substantive and conspiracy counts for purposes of sentencing and conviction; in order to avoid any ambiguity in our disposition we reverse those counts individually.