Argued and submitted September 29, 2008, affirmed July 1, 2009

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## CHRISTOPHER A. SMITH,
aka Christopher Allen Smith,
*Defendant-Appellant.*

Lincoln County Circuit Court
055377; A132905

211 P3d 961

David O. Ferry, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Rolf C. Moan, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Brewer, Chief Judge, and Riggs, Senior Judge.

BREWER, C. J.

**BREWER, C. J.**

Defendant appeals his convictions for first-degree burglary (ORS 164.225), conspiracy to commit first-degree burglary (ORS 161.450), second-degree robbery (ORS 164.405), conspiracy to commit second-degree robbery (ORS 161.450), and second-degree theft (ORS 164.045). The convictions arise from defendant's involvement in the crimes described in our opinion in *State v. Paolone*, 228 Or App 369, 209 P3d 324 (2009), a home invasion case involving one of defendant's codefendants. On appeal, defendant raises 11 assignments of error; five relate to the trial court's denial of defendant's motions for judgments of acquittal, four relate to admission of evidence, and two relate to sentencing. For the reasons explained below, we affirm defendant's convictions and sentences.

■ Because a jury found defendant guilty, we state the facts in the light most favorable to the state. *State v. Johnson*, 225 Or App 545, 547, 202 P3d 225 (2009). When we evaluate whether the erroneous admission of evidence was harmless, however, we "review all pertinent portions of the record, not just those portions most favorable to the state." *State v. Maiden*, 222 Or App 9, 11, 191 P3d 803 (2008), *rev den*, 345 Or 618 (2009). As we recounted in *Paolone*,

"[defendant] * * * believed that Maschka, one of the victims, had stolen [defendant's] wallet, which contained a substantial amount of money. [Defendant] offered to pay [Paolone] and another codefendant, McDonough, to beat up Maschka in retaliation for the supposed theft. McDonough and [Paolone] agreed to assault Maschka but declined a direct payment. [Defendant] drove [Paolone] and McDonough toward Maschka's former residence. On the way, [defendant] drove by the house of Miller and Grimes, who were friends of both [defendant] and Maschka. [Defendant] had been to the Miller and Grimes's residence many times and knew that Grimes had recently received an inheritance of $10,000, that Miller and Grimes kept their most valuable possessions in an attic above their bedroom, and that the attic was reached by a set of stairs that pulled down from the ceiling in the bedroom. Maschka had previously lived in the attic room for a short time. Neither McDonough nor [Paolone] knew Miller or Grimes, or had previously been in their home.

"When he went by the house where Miller and Grimes lived, [defendant] saw Maschka's car parked in front. He * * * let McDonough and [Paolone] out of the car and told them to call him when they were through assaulting Maschka. The assault, however, did not go as McDonough and [Paolone] had expected. The two went to the front door and walked into the living room without knocking. They identified Maschka, asked him whether he thought it was funny to take people's money, and punched him. At the same time, they saw that Miller's and Grimes's two young daughters were in the room. McDonough pushed Grimes and the children into the children's bedroom. Grimes and the children then left through an outside door in that room and ran to a neighbor's house to call the police. At about the same time, and before McDonough and [Paolone] could complete their assault of Maschka, Miller attacked [Paolone], and the two grappled for a time. [Paolone] pulled Miller's sweatshirt over his face so he could not see. While they were tussling, Maschka escaped out the front door. [Paolone] had brought a .22 caliber pistol with him, and during the struggle, the pistol fired. [Paolone] then called McDonough for help. Together, they broke free from Miller, hit him sufficiently to bruise him, and left.

"After McDonough had sent Grimes and the children to the children's bedroom, and while Miller and [Paolone] were grappling, McDonough went into Miller's and Grimes's bedroom and up the pull-down stairs into the attic, which he ransacked. From the attic, he took an electric guitar, the small case in which Grimes previously had kept the money from her inheritance, and several marijuana pipes from Miller's collection. McDonough carried those things with him when he and [Paolone] left the house. The entire episode took approximately five minutes. McDonough and [Paolone] then called [defendant], who picked them up in his van. A few minutes later, police stopped the van both for a traffic violation and because they suspected that it was connected to the events at the home of Miller and Grimes. * * * After Grimes identified McDonough and [Paolone], police officers arrested all three occupants of the van.

"While McDonough was in custody, he made a number of statements to Officer Eskridge that the court admitted into evidence over defendant's objection."

228 Or App at 371-75 (footnotes omitted). All three defendants were indicted on a number of charges stemming from the home invasion and assaults, and were tried together. Although defendant and Paolone testified, McDonough exercised his right against self-incrimination and did not testify.

We begin by briefly discussing defendant's claim—presented in five assignments of error—that the state did not introduce sufficient evidence to convict him of any of the crimes; if he is correct, it will obviate the need to discuss his other assignments of error. When reviewing a sufficiency of the evidence claim, we examine the record and all reasonable inferences that may be drawn from it in the light most favorable to the state to determine whether a rational factfinder could have found all the elements of the offense beyond a reasonable doubt. *State v. Cunningham*, 320 Or 47, 63, 880 P2d 431 (1994), *cert den*, 514 US 1005 (1995). In conducting that review, we make no distinction between direct and circumstantial evidence. *State v. Clelland*, 214 Or App 151, 154, 162 P3d 1081 (2007).

Defendant argues, with respect to each of his convictions, that, although there is no question that he conspired with McDonough and Paolone to assault Maschka, the state failed to produce evidence that he had the intent to take the property of Miller and Grimes, thus requiring reversal of all of his convictions. Defendant asserts that

"all of the crimes with which defendant was charged required the state to prove that defendant had the intent to take the property of Miller or Grimes. Because the state did not present sufficient evidence to establish that common element, the trial court should have granted defendant's motions for judgment of acquittal."

Defendant was convicted of three property crimes—first-degree burglary, second-degree robbery, and second-degree theft. The state's theory was that he aided and abetted McDonough and Paolone in the crimes they committed against Miller and Grimes. In addition, defendant was convicted of conspiracy to commit first-degree burglary and conspiracy to commit second-degree robbery. To convict defendant of the substantive crimes, the state was required to prove that defendant, with "the intent to promote or facilitate

the commission of the crime," aided or abetted or agreed or attempted to aid or abet the codefendants "in planning or committing the crime." ORS 161.155(2).

On this record, a rational juror could have found that defendant intended to deprive the victims of their property. It was defendant's idea to go to Grimes's and Miller's house. Defendant, who regularly had visited the house in the past, was the only one of the three who knew about the small wooden box that purportedly had the cash from Grimes's inheritance in it; he also was the only one who had been in the house before and thus, the only one who knew the location of the box and the stairs to the attic. In fact, defendant had been in the attic a number of times, and he had seen the box when it had cash in it. He also had smoked marijuana with Miller in the attic, and he would have seen Miller's marijuana pipe collection, which Miller kept in plain view. Defendant drove Paolone and McDonough to the site of the crime and dropped them off; he then waited for them and picked them up afterward. He drove the codefendants and the property they had stolen away from the scene of the crime.

Viewing that evidence in the light most favorable to the state, a rational trier of fact could have found each of the elements of the property crimes (on an aid and abet theory) beyond a reasonable doubt. That is, even though the state presented no direct evidence of defendant's intent to deprive the victims of their property, the jury reasonably could have inferred from the evidence that defendant told McDonough and Paolone—who stole nothing from the rest of the house and ransacked only the attic—where the valuable items were and that he intended for them to take them. *See State v. Rose*, 311 Or 274, 282, 810 P2d 839 (1991) ("Evidence of a defendant's intent is rarely, if ever, proven by direct evidence. Intent is an operation of the mind, and it is seldom susceptible of direct proof. This subjective fact is usually established by a consideration of objective facts, and from these objective facts an ultimate conclusion is drawn.").

Similarly, the jury reasonably could have found that defendant "agree[d] with one or more persons to engage in or cause the performance" of the conduct that constituted the

underlying crimes. *See* ORS 161.450(1) (defining conspiracy). The evidence demonstrates that McDonough's discovery of and entry into the attic, and McDonough's and Paolone's decision to take the particular items that they took from the attic, must have resulted from information that they had received from defendant before they entered the house, and from a plan that defendant formulated with them. The evidence demonstrated that defendant—the only one of the three who knew about the attic's contents and their potential value—necessarily had conspired with McDonough and Paolone to take at least some of the stolen property. In short, the evidence entitled the jury to infer that defendant helped plan, and must have directed, the seizure of property from the attic; no other theory can explain McDonough's actions. The evidence further entitled the jury to find that defendant intended, through his actions, to ensure the removal of the victims' property. The state presented sufficient evidence to support defendant's convictions for conspiracy and for the underlying property crimes.

Defendant also argues, as a separate matter, that he could not have been convicted of second-degree robbery on an aid and abet theory. ORS 164.405(1)(b) provides that a person commits second-degree robbery "if the person violates ORS 164.395 [defining third-degree robbery]" and "is aided by another person actually present." Defendant asserts that, because he was not "actually present" when the robbery took place, he could be convicted, at most, of only third-degree robbery. Defendant cites our opinion in *State v. Rennells*, 213 Or App 423, 439, 162 P3d 1006 (2007), in support of his position.

*Rennells*, however, does not support defendant's position. In *Rennells*, the court emphasized that its discussion pertained "solely to a defendant's *direct* liability for violating ORS 164.405(1)(b)." 213 Or App at 435 (emphasis in original). The court explicitly stated that it was not "consider[ing] the availability * * * of 'aid-and-abet liability,'" *id.*, such as that underlying the state's theory in this case. Here, because defendant does not dispute that McDonough and Paolone committed second-degree robbery—each was aided by another person actually present—and, as explained above, there was overwhelming evidence that defendant

aided and abetted them in committing that crime, the evidence was sufficient to support defendant's conviction for second-degree robbery.[1] We turn to defendant's evidentiary assignments of error.

■■■ At trial, Officer Eskridge testified regarding statements that McDonough had made to him after the van was stopped. Among other statements, Eskridge recounted the following:

- McDonough said that Paolone told him to "go upstairs and get the guitar and gave him directions where to look for the stairs";

- McDonough said that Paolone told him, "[W]e gotta get goin' ";

- McDonough said that he called defendant for a ride after committing his crime; and

- McDonough said that Paolone "threw [flex cuffs and duct tape] at him * * * and told him to put them in his pack."

In four assignments of error, defendant asserts that the trial court erred in admitting each of those statements.

Defendant argues that each of McDonough's statements recounted by Eskridge was inadmissible hearsay and that their admission violated his right to confront witnesses under Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution. The state responds, first, that any error in admitting the statements was harmless. It then asserts, alternatively, that each statement was correctly admitted by the trial court. For the reasons set forth below, we agree that any error in admitting Officer Eskridge's testimony recounting McDonough's statements was harmless. Accordingly, we do not address whether the statements were correctly admitted.

■■ Generally, we will affirm a judgment of conviction notwithstanding the erroneous admission of evidence if there is "little likelihood" that the admission of the evidence

---

[1] In this case, unlike in *Rennells*, the jury received a general "aid-and-abet liability" instruction.

affected the verdict. *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003); *see* OEC 103(1) ("[e]vidential error is not presumed to be prejudicial").

> "As the court explained in *Davis*, the correct focus of that inquiry 'is on the possible influence of the error on the verdict rendered, not whether this court, sitting as a factfinder, would regard the evidence of guilt as substantial and compelling.' *Id.* As an initial step, the court determines the particular evidentiary issue that is subject to harmless error analysis. *Cf. State v. Cook*, 340 Or 530, 544-45, 135 P3d 260 (2006) (applying that process in the context of a federal harmlessness analysis). After identifying the pertinent issue, the court considers the nature of the erroneously admitted evidence in the context of other evidence on the same issue. *See State v. Gibson*, 338 Or 560, 576-77, 113 P3d 423, *cert den*, 546 US 1044 (2005) (pursuing that inquiry). In determining the possible influence of the error on the verdict, we also consider the importance of the erroneously admitted evidence to a party's theory of the case. *State v. Perkins*, 221 Or App 136, 145, 188 P3d 482 (2008) (declining to find harmlessness where erroneously admitted evidence went 'directly to the heart of [the state's] factual theory of the case') (quoting *Davis*, 336 Or at 34). 'If erroneously admitted evidence relates to a "central factual issue" to the case, it is more likely to have affected the determination than if it dealt with a tangential issue.' *State v. Roller*, 201 Or App 166, 173, 118 P3d 804 (2005). In short, our function is to determine whether, given the nature of the erroneously admitted evidence and its relationship, as framed by the parties' presentations, to the matters essential to the jury's verdict, there was 'little likelihood' that that evidence affected the verdict. *Davis*, 336 Or at 32."

*State v. Vargas-Samado*, 223 Or App 15, 19, 195 P3d 464 (2008). If the claimed error implicates the federal constitution, as it does in this case, we will affirm only if we conclude that the asserted error was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 US 18, 24, 87 S Ct 824, 17 L Ed 2d 705 (1967) (describing that standard).

We begin with Eskridge's testimony that McDonough said that Paolone had told him to "go upstairs and get the guitar and gave him directions where to look for the stairs." As discussed above, the state's theory of defendant's criminal

responsibility for the property crimes was based on his aiding and abetting McDonough and Paolone in their commission of the crimes at the Miller and Grimes's residence. The trial court instructed the jury that a person aids or abets another person in the commission of a crime if the person: "(1) With the intent to promote or make easier the commission of the crime, (2) [e]ncourages, procures, advises, or assists, by act or advice, the planning or the commission of the crime." The state's theory regarding the conspiracy counts was that all three defendants agreed to commit the crimes that McDonough and Paolone carried out and that defendant aided and abetted the commission of the crimes.

The question, then, is whether we can conclude, beyond a reasonable doubt, that the admission of McDonough's statement did not affect the verdicts against defendant. Applying that standard, we conclude that any error was harmless. There is no question that either McDonough, Paolone, or both of them committed the crimes that serve as the basis for defendant's convictions, convictions that were based on an aiding and abetting theory. Although McDonough's statement that Paolone had told McDonough to get the guitar and that he had told him where the stairs were might affect a jury's view of the allocation of criminal liability as between Paolone and McDonough, it logically would not affect defendant's culpability.[2] That is so because, regardless of which of defendant's codefendants instigated the trip up the stairs, defendant's criminal liability remains the same. The evidence was uncontroverted that, before they entered the house, neither McDonough nor Paolone knew anything about the existence of the box that purportedly had money in it or the other items that could be reached only by way of pull-down stairs; the evidence is equally clear that defendant was aware of the box, the contents of the attic, and the route to the attic. It is also uncontroverted that both codefendants left the victims' house with loot in hand, that defendant picked them up in his van, and that all three fled together. In light of those facts, Paolone's

---

[2] In *Paolone*, we concluded that admission of that statement was not harmless beyond a reasonable doubt *vis-à-vis* Paolone. 228 Or App at 378. As explained in the text, however, because of defendant's different role and because of the state's theory of the case, the analysis is different in this case.

purported statement to McDonough telling him to get the guitar and telling him where the stairs were was of minimal, if any, relevance as to defendant's guilt and therefore could not have affected the verdict against him.

Nor could Paolone's purported statement, "we gotta get goin'," have affected the verdict against defendant. In the context of an ongoing crime, such as that at issue here, the statement is virtually meaningless. In any event, it could not have influenced the jury's verdict against defendant, who was not even present at the time. Admission of that statement, even if error, was harmless beyond a reasonable doubt.

The third challenged statement—McDonough's statement to Officer Eskridge that he had called defendant for a ride after committing his crime—also could not have affected the verdict. Defendant himself testified that he dropped McDonough and Paolone off at Grimes's and Miller's house and that he waited for McDonough to give him a call. He testified that, after the home invasion, McDonough "called me and asked me for a ride." In light of defendant's own testimony, McDonough's statement was merely cumulative and its admission, even if error, was harmless.

Finally, we also conclude that the admission of McDonough's statement that Paolone "threw [flex cuffs and duct tape] at him * * * and told him to put them in his pack," if error, was harmless beyond a reasonable doubt.[3] First, the state introduced independent evidence that police officers discovered flex cuffs in McDonough's backpack, which was found when defendant's van was stopped. Second, like the other challenged evidence, it is hard to conjure up a way in which that statement could have affected the jury's verdict against defendant, given the state's aid-and-abet theory of the case regarding defendant. Whether or not Paolone threw flex cuffs and duct tape at McDonough and told him to put them in his pack is not logically relevant to defendant's aid-and-abet liability for the codefendants' crimes. Admission of that statement does not provide a basis for reversal. In short, we conclude that none of the statements that defendant

---

[3] "Flex cuffs are plastic handcuffs that the police use when, for one reason or another, standard metal handcuffs are unsuitable or unavailable." *Paolone*, 228 Or App at 373 n 5.

claims was erroneously admitted would have affected the verdict; any evidentiary error was harmless beyond a reasonable doubt.

Finally, in his sentencing assignments of error, defendant asserts that (1) the trial court erred in placing his first-degree burglary conviction in crime category 9 on the sentencing guidelines grid, and (2) the trial court erred in imposing a 70-month minimum prison term under Ballot Measure 11 on defendant's second-degree robbery conviction. We rejected the same argument that defendant makes in support of the latter assignment of error in *State v. Cobb*, 224 Or App 594, 598, 198 P3d 978 (2008). Regarding the former assignment of error, the trial court entered an amended judgment that the parties agree renders that assignment of error moot.

Affirmed.