Argued and submitted September 29, 2009, convictions for aggravated murder and felony murder reversed and remanded; otherwise affirmed July 28, respondent's petition for reconsideration filed September 2 allowed by opinion October 13, 2010
See 237 Or App 688, 240 P3d 753 (2010)

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# PETRONILO LOPEZ-MINJAREZ,
*Defendant-Appellant.*

Washington County Circuit Court
C053660CR; A134227

237 P3d 223

Shawn E. Wiley, Chief Deputy Public Defender, argued the cause for appellant. With him on the briefs was Peter Gartlan, Chief Defender, Appellate Division, Office of Public Defense Services. Petronilo Lopez-Minjarez filed the supplemental brief *pro se*.

Anna Maria Joyce, Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Erika L. Hadlock, Acting Solicitor General.

Before Sercombe, Presiding Judge, and Brewer, Chief Judge, and Deits, Senior Judge.*

BREWER, C. J.

---

* Brewer, C. J., *vice* Edmonds, P. J.

-

## BREWER, C. J.

Following a jury trial, defendant was convicted of six counts of aggravated murder, ORS 163.095; two counts of felony murder, ORS 163.115; one count of first-degree kidnapping, ORS 163.235; one count of second-degree assault, ORS 163.175; and two counts of first-degree burglary, ORS 164.225. The jury sentenced defendant to life imprisonment without the possibility of parole. On appeal, he raises two assignments of error. First, defendant asserts that the trial court erred in giving the "natural and probable consequences" uniform jury instruction addressing accomplice liability. Second, defendant claims that the trial court erred in excluding expert psychological testimony that he was prone to submission to his father, the co-perpetrator in the crimes. Defendant also has filed a *pro se* supplemental brief in which he makes a number of other arguments. We reject defendant's second assignment of error and the arguments raised in his *pro se* brief without discussion. For the reasons explained below, we reverse in part and remand.

"Because defendant was convicted of the charged offenses, we state the facts in the light most favorable to the state," *State v. Viranond*, 346 Or 451, 453, 212 P3d 1252 (2009), except as otherwise noted. Sometime in 2001 or 2002, defendant's mother began having an extramarital affair with Armando Saul Lopez-Villatoro. Word of the affair eventually reached defendant's family after Lopez-Villatoro's daughter confronted defendant's mother and, the following day, defendant's sisters got into a physical confrontation with Lopez-Villatoro's daughter. Defendant's father initially refused to acknowledge the affair, but in November 2004, he was provided with proof of the affair. Like the rest of his family, defendant was upset when he learned of the affair.

The night before the murder, which was committed in late November 2004, an attendant working at a gas station near the intersection of Highways 26 and 47, west of Portland, sold gas to defendant and his father, who were in defendant's white four-wheel-drive pickup truck. Defendant and his father told the attendant that they had been out sightseeing on the back roads. Two shovels were in the bed of the truck.

The following day—the day of the murder—the same gas station attendant saw defendant's truck on a turn-out about five miles up Highway 47 from the gas station; the turn-out was near a road that leads "up into the woods." That turn-out was just over a mile from where the victim's remains were found. During the afternoon of the murder, defendant's father twice called the Lopez-Villatoro home from pay telephones. Later that day, defendant's father arrived, unannounced, at defendant's house. He was upset about his wife's affair. Defendant had been drinking beer and, when his father arrived around 5:00 p.m., they went out to purchase a case of beer, which they consumed. From the store where they purchased the beer, defendant's father again telephoned the Lopez-Villatoro home. Defendant's wife later went out to purchase more beer for defendant and his father. As the men sat drinking beer—"[a] lot" of beer, according to defendant's wife—defendant's father talked about being upset with his wife, defendant's mother. Sometime while he was at defendant's house, defendant's father made another telephone call to the Lopez-Villatoro home. At about 9:00 p.m., the two men left defendant's house in defendant's truck.

Defendant and his father drove to Lopez-Villatoro's house in Aloha. Lopez-Villatoro, his wife, and one of his sons were out of town on a business trip. Lopez-Villatoro's other son, the victim in this case, was spending the evening with his girlfriend. No one was home at the Lopez-Villatoro home when defendant and his father arrived. Shortly thereafter, however, the victim arrived in his car. Defendant testified that his father pushed the victim into the house and, after screaming at him, shot him with a .38 caliber handgun he had brought with him. Blood matching the victim's blood was later found on the stairs and walls of the Lopez-Villatoro home. Although defendant testified that he never entered the house, the state's theory was that both he and his father entered the house and shot the victim. That theory was supported by some of defendant's contradictory statements and evidence about the layout of the home.

After the victim was shot and wounded, the three men headed toward defendant's truck, with defendant and his father "basically dragging" the victim, according to an

eyewitness neighbor. As they approached defendant's truck, the neighbor confronted them. In response, either defendant or defendant's father turned toward the neighbor and displayed a handgun. The neighbor left and crouched behind a gas meter, around the corner of the house. Defendant and his father placed the wounded victim into defendant's truck and drove off. As they left, the neighbor noted the license plate number and called police to report what had happened.

As they drove, the victim was sitting between defendant and his father, in the front seat of the truck. Defendant's father was holding the gun to the victim's ribs. At some point after leaving the victim's house, defendant told his father that he needed gas for the truck. He dropped his father and the victim off at a construction site, and he filled the truck up with gas; he then returned to where he had left the victim and his father and picked them up.

At this point in the narrative, defendant's story again diverges from that of the state. According to defendant, his father dropped him off at a McDonald's restaurant and left with the victim. Defendant testified that he spent 30 to 40 minutes hiding in the restroom of the restaurant before his father returned. When his father returned and picked him up, according to defendant, the victim was no longer with him; the father told defendant to start cleaning up the blood in the truck. The pair returned to defendant's house.

The state's theory was that defendant was never dropped off at the McDonald's restaurant. Instead, the state asserted, defendant and his father both took the victim into the woods off Johnson Road to a place that commonly was used for target shooting—and where the victim's body was later found—and shot him to death. The state introduced evidence that none of the employees at the McDonald's saw defendant on the night of the murder. It also introduced evidence that the distance from where the victim's body was found and the McDonald's where defendant claimed he had hidden out could not have been driven in the time that defendant claimed he was away from his father. Finally, the state introduced evidence that defendant and his father had previously gone target shooting in the woods at or near the area where the victim's body later was discovered by bow hunters.

When defendant and his father arrived at defendant's house, defendant's father left in his car; he has not been seen since. Defendant immediately went inside and took a shower. When police officers—who were monitoring the house—were alerted that defendant's truck was observed at his house, they approached the house. Defendant's wife answered the door, and the officers asked for defendant. Defendant came to the door and yelled, "Go ahead and shoot me, I'm not afraid of you white cops." Defendant then said, "Go ahead and arrest me." The police officers did so.

When officers examined defendant's truck, they saw blood on the outside of the passenger door, on a car seat in the back, on a diaper bag sitting on top of the car seat, on the floorboard in the back of the truck, and on the passenger side door. The shovels were still in the bed of the truck. Later, a forensics team found blood on the windshield, the dashboard, the passenger's seat, the steering wheel, the back floor, and on magazines strewn in the vehicle. A criminalist found blood on jeans that appeared to belong to defendant. Two spent .38 caliber shell casings and one live .38 caliber round were found in the truck. Blood was also found inside the bathtub and on the base of the tub where defendant had just showered. The blood found on the jeans and the blood in the truck matched the victim's DNA profile. Defendant ultimately was charged with a number of crimes, as related above.

Before closing arguments, after both parties rested, the court and counsel discussed the parties' proposed jury instructions. The state had requested that the court give Uniform Criminal Jury Instruction No. 1052, "Aider Or Abettor—Liability For Probable Consequences." That instruction states:

> "A person who aids or abets another in committing a crime, in addition to being criminally responsible for the crime that is committed, is also criminally responsible for any acts or other crimes that were committed as a natural and probable consequence of the planning, preparation, or commission of the intended crime."

Defense counsel objected to the proffered instruction on "natural and probable consequences." Citing *State v.*

*Anlauf*, 164 Or App 672, 995 P2d 547 (2000), defense counsel argued:

> "[T]his [instruction] didn't come out of a statute. It was a dicta statement taken out of a 1961 case. And that case is [of] very, very questionable vitality, as they point out in *Anlauf*, because it was decided prior to the criminal code that they abrogate a distinction between principals in the first and second degree."

The prosecutor responded that the proposed instruction accurately states the law.

After further discussion, the court rejected defendant's argument:

> "I didn't find any case law that says that jury instruction is inappropriate. And in the last go-around of the criminal jury instructions it was again included as a[n] approved criminal jury instruction in the latest version that just came out. * * *
>
> "* * * * *
>
> "* * * [A]s I indicated, there is no case that says this instruction is inappropriate or shouldn't be given. It has, again, been produced as the appropriate aider and abettor liability for probable consequences."

At trial, the state's theory was that defendant was directly involved in each crime or, alternatively, that he was guilty as an accomplice on the burglary, assault, and murder charges. The prosecutor introduced evidence and argued that defendant was present and took an active part in all the crimes, including the victim's murder. For example, in his closing argument, the prosecutor asserted that "[t]his case started out as a Burglary, it then turned into an Assault, it then turned into a Kidnapping, and eventually it went [to] the defendant and his father taking [the victim] to Johnson Road and killing him. That was murder." As noted, the prosecutor also presented a theory of accomplice liability:

> "I want to make clear that while the concepts of aiding and abetting [are] going to be significant throughout the case, the State's position is that the evidence in this case demonstrates that the defendant and his father were equal participants in this crime from beginning to end. * * * However,

there will be points in time where we'll be talking about aiding or abetting and using those concepts to find the defendant guilty."

The prosecutor, in describing the jury instructions, also stressed that the instructions regarding aiding and abetting "are going to be pretty significant in this case." The prosecutor discussed extensively the concepts of aiding and abetting. He emphasized the principle that an accomplice is guilty of any crime that is the natural and probable consequence of a crime he aided and abetted:

"And then, finally, *maybe the most significant concept*, a person who aids or abets another in committing a crime, in addition to being criminally responsible for the crime that is committed is also criminally responsible for any acts or other crimes that were committed as a natural and probable consequence of the planning, preparation or commission of the intended crime.

"So when you aid or abet somebody in committing a certain crime, if in the course of that crime something happens that's natural and probable, you're also on the hook for that crime, as well."

(Emphasis added.) The state, in short, asked the jury to convict defendant either as a principal or as an accomplice, and the prosecutor highlighted the natural and probable consequences principle as a significant feature of accomplice liability.

In closing, the prosecutor proceeded sequentially through the charges, discussing the evidence that supported each. Regarding the assault and burglary charges—which stemmed from the victim being shot in his father's house—the prosecutor argued that, "[w]e don't know who shot [the victim at the house.] Frankly, if you're going to bet on it, you'd probably bet on his dad." But, the prosecutor argued, it did not matter, as defendant was at least an accomplice. Emphasizing the aiding or abetting theory of liability and the natural and probable consequences principle, the prosecutor argued:

"So if the defendant's father shot [the victim], at the point in time when [defendant] was participating in this Burglary, at that point, he's guilty of Burglary in the First

Degree and Assault in the Second Degree on an aiding or abetting theory. This is the point where we're getting into the aiding or abetting.

"So what's important is obviously the law for aiding and abetting, and the idea that you are liable for the natural and probable consequences of the planning, preparation or commission of these crimes."

Regarding the aggravated murder and murder charges, the prosecutor asserted that defendant was directly involved in killing the victim: "Every piece of evidence that you have in this case that's worthy of belief has the defendant and his father at Northwest Johnson Road when [the victim] was killed." Thus, the state's primary theory was that defendant was at the scene of the murder and not at the McDonald's when the victim was killed.

But, as with the assault, the prosecutor hedged his bets:

"[W]e don't have evidence as to who killed [the victim] at Northwest Johnson Road. We know that it was either the defendant, his father, or the two of them together.

"If you find that the defendant's father killed [the victim], that is enough for the defendant to be convicted of Murder. Again, we're getting into aiding and abetting."

Following arguments, over defense counsel's renewed objection, the trial court instructed the jury in accordance with the uniform instruction:

"A person who is involved in committing a crime may be charged and convicted of that crime if, with the intent to promote or facilitate the commission of the crime[,] that the person aids and abets someone in committing the crime. Under these circumstances, it is not necessary for that person actually to be personally present at the time and place of the commission of the crime.

"A person aids and abets another person in the commission of a crime if the person, one, with the intent to promote or make easier the commission of the crime[,] two, encourages, procures, advises or assists by act or advice the planning or commission of the crime.

"A person who aids and abets another in committing a crime, in addition to being criminally responsible for the crime that is committed, is also criminally responsible for any act or other crime that [was] committed as a natural and probable consequence of the planning, preparation or commission of the intended crime."

After the court instructed the jury, defense counsel once again reiterated his objection to the natural and probable consequences instruction. The jury convicted defendant of the crimes set out above.

■       On appeal, defendant renews his argument that the "natural and probable consequences" instruction is not an accurate statement of the law:

"This vestige from the common law has no place in any trial, and is contrary to the statutory definition of aid and abet liability. When given in a case such as this, it tells the jury that defendant can be found guilty of not only those acts which he intended to aid and abet, but also those acts . that he did not intend to aid and abet. The statute making one criminally liable for acts not one's own permits a guilty finding only for those acts which a person intends to aid and abet."

Defendant asserts that the trial court's instruction not only was inconsistent with ORS 161.155, which defines accomplice liability, but also violated his Sixth Amendment jury trial right, his right to due process under the Fourteenth Amendment, and (in a footnote) his jury trial right under Article I, section 11, of the Oregon Constitution.[1] The state responds that the trial court's instruction accurately stated the law. In any event, it asserts, any error in giving the instruction was harmless. As explained below, we agree with defendant.

_____

[1] Defendant raised no constitutional argument before the trial court, nor does he argue on appeal that the trial court committed plain error under either constitution. Accordingly, we do not address his constitutional arguments on appeal. *See State v. Moore*, 324 Or 396, 407, 927 P2d 1073 (1996) (refusing to address constitutional argument not made in trial court); *State v. Callender*, 181 Or App 636, 648, 47 P3d 514, *rev den*, 334 Or 632 (2002) (refusing to address constitutional claim when only statutory argument was made in trial court).

■    "We review jury instructions as a whole and will reverse only if we can fairly say that the instructions probably created an erroneous impression of the law in the minds of the jurors that affected the outcome of the case." *Maas v. Willer*, 203 Or App 124, 129, 125 P3d 87, *rev den*, 340 Or 411 (2005); *see also State v. Oatney*, 335 Or 276, 290, 66 P3d 475 (2003), *cert den*, 540 US 1151 (2004) ("In determining whether it was error to give a particular instruction, the instructions are read as a whole to determine whether they accurately state the law."). The pertinent "law" in this case is the accomplice liability statute, ORS 161.155, which provides, as relevant, that "[a] person is criminally liable for the conduct of another person constituting a crime if * * *[w]ith the intent to promote or facilitate the commission of the crime[,] the person * * * [a]ids or abets or agrees or attempts to aid or abet such other person in planning or committing the crime[.]" If the challenged instruction in this case probably created an impression of the law that is inconsistent with that provision, and if that misimpression affected the verdict, we must reverse.

Defendant argues that the allegedly erroneous instruction is inconsistent with ORS 161.155 in that it allows a jury to hold a defendant criminally liable not only for the crime or crimes he intended to aid or abet, but for any other crime that the jury concludes is the "natural and probable" consequence of the crime aided or abetted. He asserts that the allegedly erroneous instruction likely affected the outcome of the case:

"The effect of [the instruction] is easily seen in this case. Defendant's version of events [was that] he drove to the victim's house with his father * * *, he was surprised when his father pulled out a gun, he was outside the house when his father shot [the victim], and he drove his father and [the victim] to McDonald's, where he got out of the car and had no further involvement in the crimes.

"* * * * *

"The effect of the erroneous instruction is most easily seen with regard to the murder charges. Defendant all but conceded involvement in the kidnapping by admitting that he drove his father and [the victim] away from [the victim's]

home. Given the trial court's erroneous 'natural and probable consequences' instruction, the jury was free to base accomplice liability for the murder on its conclusion that the murder was a natural and probable consequence of the kidnapping, without ever considering, much less finding, whether defendant intended to promote or facilitate the murder, or whether he actually aided or abetted his father in killing [the victim]. The instruction thus allowed the jury to convict defendant of murder without determining the essential elements of the offense, and upon a lesser culpable mental state than ORS 161.155 requires."

(Footnote omitted.) For the reasons set out below, we agree with defendant that the instruction is not a correct statement of the law.

■■ In determining whether the "natural and probable consequences" instruction accurately states the law, we must construe ORS 161.155, the provision that governs accomplice liability. To discern legislative intent, we begin by examining the statutory text and context and, if it appears useful to the analysis, any legislative history offered by the parties. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). We first consider the text, which is the best indication of the legislature's intent. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993).

ORS 161.155 provides:

"A person is criminally liable for the conduct of another person constituting a crime if:

"(1) The person is made criminally liable by the statute defining the crime; or

"(2) With the intent to promote or facilitate the commission of the crime the person:

"(a) Solicits or commands such other person to commit the crime; or

"(b) Aids or abets or agrees or attempts to aid or abet such other person in planning or committing the crime; or

"(c) Having a legal duty to prevent the commission of the crime, fails to make an effort the person is legally required to make."

As defendant correctly points out, nothing in that provision purports to extend criminal liability to all acts that are the "natural and probable consequence" of an act that the defendant intended to aid and abet, nor does that phrase appear in the statute. Rather, the statute imposes criminal liability only for the crime that the defendant intended to facilitate by aiding and abetting in its planning or commission. That phrasing is important. As the consistent use of the definite article "the" suggests, the legislature did not aim to impose liability for any crime other than the one that the defendant intended to promote or facilitate. *See, e.g., State v. Branam*, 220 Or App 255, 260, 185 P3d 557, *rev den*, 345 Or 301 (2008) ("The fact that the legislature used the definite article 'the' and the singular form of the noun 'sentence' suggests that it intended the requirements in ORS 137.225(1)(a) to apply to only one particular sentence."); *Klamath County School Dist. v. Teamey*, 207 Or App 250, 263, 140 P3d 1152, *rev den*, 342 Or 46 (2006) (use of singular noun "order" indicates reference to "one particular order"); *Roop v. Parker Northwest Paving Co.*, 194 Or App 219, 252, 94 P3d 885 (2004), *rev den*, 338 Or 374 (2005) (statute using definite article "the" and singular noun "purpose" construed as meaning "the *only* purpose" (emphasis added)).[2] In short, the text of the statute does not support the instruction that the court gave.

We next consider the legislative history of the provision. The state asserts—and defendant does not disagree—that the Oregon Supreme Court has previously commented favorably on a "natural and probable consequences" instruction. The state argues further—and here, defendant does *not* agree—that the principle was part of the common law and that the legislature did not intend to change that common-law concept when it enacted ORS 161.155. We begin with the

---

[2] The state asserts that the aiding and abetting statute is worded almost identically to the conspiracy statute, so that cases interpreting the latter are relevant to our interpretation of the former. We disagree. ORS 161.450(1) states, "A person is guilty of criminal conspiracy if with the intent that conduct constituting *a crime* punishable as a felony or a Class A misdemeanor be performed, the person agrees with one or more persons to engage in or cause the performance of such conduct." (Emphasis added.) Moreover, in addition to imposing liability for underlying crimes, conspiracy is a separate crime, unlike aiding and abetting, which is merely a means of imposing criminal liability on one person for the conduct of another.

Supreme Court's statements regarding criminal liability for "natural and probable consequences."

In *State v. Fichter*, 226 Or 526, 360 P2d 278 (1961), the defendant argued on appeal that the state had introduced no evidence to show that he had aided and abetted his codefendants in robbing two teenage boys of their groceries. The court rejected the defendant's argument, apparently viewing the record as supporting direct liability for the crime:

> "Despite defendant's denial, there was direct evidence of his participation in acts of violence against the two boys. The court could not say as a matter of law that there was not a strong inference created of an intent to steal or rob by defendant's participation in the acts of violence."

*Id.* at 532-33.

*Fichter* would seem to have little to do with this case, except that the court, in passing, quoted its view of the relevant law:

> " 'It is not always necessary, however, to render one guilty of a crime as a principal in the second degree or accessary [*sic*] before the fact, that he shall have *contemplated or expressly* assented to the commission of the particular crime. The general rule is that, if several persons combine or conspire to commit a crime, or if persons command or counsel a crime, or aid and abet in an attempt to commit a crime, or if several engage in an unlawful enterprise, each is responsible as principal in the second degree or accessary [*sic*] before the fact, according to the circumstances, for all acts committed by the others in the execution of the common purpose, if such acts are a natural or probable consequence of the unlawful combination or undertaking.' "

*Id.* at 531-32 (quoting Clark and Marshall, *Crimes* § 183 (5th ed 1952)) (emphasis by *Fichter* court). That *dictum* arguably supports the state's view that common law recognized the natural and probable consequences rule in criminal cases.

The Supreme Court also discussed the "natural and probable consequences" principle in *State v. Gibson*, 252 Or 241, 448 P2d 534 (1968). In that case, the defendant and a codefendant followed the victim out of a tavern, beat him, and robbed him of his wallet. "Each defendant swore that the other took [the victim's] billfold and money. The victim swore

that [the codefendant] took his money while [the defendant] had him down and was kicking him." *Id.* at 243. On appeal, the defendant challenged a jury instruction that told the jurors that "one codefendant would be legally responsible for 'any other crime committed in pursuance of the intended crime and which, under the circumstances, is a natural and probable consequence of the intended crime.' " *Id.* at 245.

The defendant in *Gibson* argued that the instruction suggested to the jury that robbery is a natural and probable consequence of assault and battery. The court rejected that assertion:

"The challenged instruction was virtually meaningless, and we do not believe that it was prejudicial to the defendant in this case. The evidence as a whole left little doubt that two predators had followed a chosen victim out of a tavern and had beaten him almost to death. Whether by preconceived design or not, one of them had absconded with the contents of the victim's wallet. If the two defendants were in fact acting in concert, it would make no difference which one actually took the money. A reasonable interpretation of the instruction is that if the jury thought that the particular robbery that occurred was a natural result of the enterprise in which the two men were engaged, both would be equally guilty no matter which one may have taken the money. When so understood, the instruction was a correct statement of law.

"While we agree with the defendant's proposition that robbery is not a natural and probable result of every assault and battery, the instruction did not tell the jury that it was. Accordingly, the instruction, whatever its other faults may have been, was not so misleading as to constitute reversible error."

*Id.* at 245-46 (citations and footnote omitted). The *Gibson* court, then, simply rejected the argument that the jury was improperly instructed that robbery is always a natural and probable consequence of assault and battery. The court did note, however, that the "natural and probable consequences" instruction was "virtually meaningless" and that it had "faults."

As defendant argued below and as he points out on appeal, this court too has questioned the natural and probable consequences instruction. In *Anlauf*, the defendant and his codefendant attacked a 14-year-old boy with fists and beer bottles. Toward the end of the assault, the codefendant exposed and threatened to use (but did not use) a knife. "There was no evidence that [the] defendant knew that [the codefendant] was carrying the knife or that he directly participated in [the codefendant's] activities with the knife." 164 Or App at 674. Nonetheless, the defendant was charged with unlawful use of a weapon, based on the codefendant's conduct with the knife.

The defendant assigned as error the trial court's denial of his motion for a judgment of acquittal regarding that charge, and this court agreed that the trial court erred:

> "The *only* evidence regarding his direct connection with the events involving the knife was [the victim's] testimony that, at the time [the codefendant] exposed and threatened to use the weapon, defendant was 'trying to get [the codefendant] to calm down.' There was no evidence that defendant engaged in any further criminal activities with [the codefendant] after the knife came into play, other than fleeing from the scene, and there was no evidence that defendant knew about the knife before it came into play."

*Id.* at 677-78 (emphasis in original). The state responded by citing *Fichter*'s "natural or probable consequences" formulation. But, this court explained, the *"dictum"* in *Fichter* could not be read to support the state's position:

> "Insofar as the state's theory is that guilt, as an aider or abettor under ORS 161.155, can be predicated on a coconspirator's commission of a *separate crime* to which the defendant is in no way tied, except that the crime occurred during the course of the common criminal episode, [our cases] are to the contrary."

*Id.* at 678 (emphasis in original). The *Anlauf* court also pointed out, in a footnote, that *"Fichter*'s value as authority must also be considered in light of the fact that it was decided before the adoption of the Criminal Code of 1971 and turns on the antiquated distinction between 'principals in the first and second degree.'" *Id.* at 675 n 1. In short, as we noted in

*Anlauf,* it is far from clear that the "natural and probable consequences" concept was a part of this state's criminal law before 1971 and, even if it was, the question still remains whether the enactment of the Criminal Code changed anything.

With that background, we return to the relevant statute, ORS 161.155(2). The state argues that the "legislative commentary to the Oregon Criminal Code indicates that adoption of ORS 161.155 was not meant to change the then-existing state of the law." That commentary states that, "[p]aragraphs (a) and (b) of subsection (2) do not differ substantially from present law governing accessorial liability, whether that liability arises by virtue of aiding and abetting or by virtue of conspiracy liability for substantive crimes." Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 13, 13 (July 1970). The commentary then cites a number of cases, none of which is *Fichter* or *Gibson.*[3] Moreover, none of the cases cited by the commission addressed the "natural and probable consequences" rule. The legislative history in no way contradicts the plain language of the statute. What is more, even if *Fichter* or *Gibson* remained good law following the enactment of ORS 161.155, it is far from clear that they would support the state's position here. That is so because of the minor and nondispositive role that the "natural and probable consequences" principle played in those cases, as explained above.

Based on the wording of the statute governing aid and abet liability and on the legislative history of the provision, we conclude that the "natural and probable consequences" instruction is not an accurate statement of the law and that it probably created an erroneous impression of the

---

[3] The commission cited *State v. Shannon,* 242 Or 404, 409 P2d 911 (1966); *State v. Blackwell,* 241 Or 528, 407 P2d 617 (1965); *State v. Moczygemba,* 234 Or 141, 379 P2d 557 (1963); *State v. Brown,* 113 Or 149, 231 P 926 (1925); and *State v. Johnson,* 7 Or 210 (1879). Those cases addressed various aspects of aiding and abetting liability, but not the "natural and probable consequences" principle. The commission also cited *former* ORS 161.220, *repealed by* Or Laws 1971, ch 743, § 432. That statute provided, in part, that "[a]ll persons concerned in the commission of a felony or misdemeanor, whether they directly commit the act constituting the crime or aid and abet in its commission, though not present, are principals and shall be indicted, tried, and punished as principals."

law in the minds of the jurors. Although the *Gibson* court suggested, in *dictum*, that the instruction is "virtually meaningless," we think that understates the matter; the instruction affirmatively misstates the law, at least since the enactment of ORS 161.155 in 1971. As noted above, however, we still must determine whether the erroneous instruction "probably" affected the outcome of the case. We turn to that inquiry.

■ The state asserts that any error in giving the incorrect instruction does not require reversal. It proffers two variations on a harmless error argument. First, the state claims, the instruction would not have affected the verdict "in light of the fact that the [court] properly instructed the jury on all of the elements of the crimes." Second, the state asserts a more general harmless error argument, *viz.*, that the evidence of defendant's guilt was overwhelming:

> "In all events, even if the court erred, any error was harmless because the jury instruction would not—as defendant contends—have allowed the jury to convict defendant of crimes that he did not intend to aid and abet because overwhelming evidence shows that defendant intended to aid and abet all of the crimes, including murder."

We begin with the state's first argument.

■ As stated above, "[f]or an instruction to constitute reversible error, it must have prejudiced the aggrieved party when the instructions are considered as a whole." *State v. Thompson*, 328 Or 248, 266, 971 P2d 879, *cert den*, 527 US 1042 (1999). That is, it must have "probably created" a misimpression of the law that affected the verdict. Here, the trial court first instructed the jury on accomplice liability. It is true, as the state suggests, that the trial court then correctly instructed the jury on the elements of each of the crimes. For example, the trial court instructed the jury that, to find defendant guilty of aggravated murder on the first count of the indictment (based on an intent to conceal the commission of a crime), the jury must find that defendant intentionally caused the death of the victim. And, because the court instructed the jury on 12 counts, each of which required that defendant have acted intentionally, the jury was told numerous times that defendant had to have acted with intent.

Indeed, because the jury was instructed on several lesser-included crimes, it was instructed that defendant had to have acted intentionally even more times.

Nonetheless, we reject the state's "dilution" theory. Viewed in their entirety, the jury instructions told jurors that they could convict defendant on either of two theories—and, in fact, they were never told that they had to agree on the theories. The jurors could have convicted defendant of the kidnapping, burglary, assault, and homicides because they believed that he personally and intentionally committed the crimes. Alternatively, the jury could have found that defendant committed (either directly or as an accomplice) the kidnapping, burglary, and assault, but that the murders were the natural and probable consequences of those crimes. That is, the jurors reasonably could have convicted defendant of the homicides simply because they believed that the homicides were the natural and probable consequences of the earlier crimes. Yet, that is not the law.

Had the state not repeatedly emphasized the alternative theories of criminal liability—and had the erroneous instruction not been the court's last word on accomplice liability before it turned to the individual counts—we might be more inclined to accept the argument that the erroneous instruction was "drowned out" by the correct instructions. But, in light of the prosecutor's insistence to the jury that it could convict defendant on the "natural and probable consequences" theory and the place that the erroneous instruction appeared in the instructions as a whole, we conclude that the erroneous instruction likely affected the jurors' deliberations and, ultimately, the verdict. The erroneous instruction went directly to the state's theory of the case. *Cf. State v. Perkins*, 221 Or App 136, 145, 188 P3d 482 (2008) (declining to find harmlessness where erroneously admitted evidence went directly to the heart of the state's factual theory of the case).

We also reject the state's more general harmless error argument. "The correct focus of the inquiry regarding affirmance despite error is on the possible influence of the error on the verdict rendered, not whether this court, sitting as a factfinder, would regard the evidence of guilt as substantial and compelling." *State v. Davis*, 336 Or 19, 32, 77 P3d

1111 (2003). The evidence is overwhelming that defendant's father assaulted the victim in the house and killed him later in the woods. But defendant's role in the homicide is less certain. As defendant asserts,

> "[t]he evidence that defendant participated in any crimes other than the initial assault and kidnapping of the victim boils down to eyewitness testimony that (a) placed defendant and his father on a road leading to the area where the murder took place the day before the murder, and (b) disputed defendant's claim that he waited in a McDonald's restaurant while his father drove off with the victim, then returned without the victim."

Although the state introduced evidence to contradict that testimony, the jury was entitled to believe defendant's version of events, rather than the state's.

We turn to the appropriate disposition. Defendant essentially concedes the facts that establish criminal responsibility for the kidnapping, assault, and burglary. The evidence was overwhelming that defendant personally committed the kidnapping and that he either personally committed the assault and burglary, or that he aided and abetted them with the intent to promote or facilitate the crimes. The erroneous instruction could not have affected those counts. Accordingly, we need not reverse the assault, burglary, and kidnapping convictions. But because the homicide convictions may have been influenced by the erroneous "natural and probable consequences" instruction, they must be reversed. As defendant explains,

> "[the] evidence established that defendant aided and abetted his father in assaulting and kidnapping the victim. However, that leads directly to the problems created by the jury instruction at issue in defendant's appeal. Faced with evidence that defendant aided and abetted the assault and kidnapping (and little else), jurors more than likely determined whether the victim's murder was a natural and probable consequence of those earlier crimes."

In sum, we conclude that the trial court erred in giving the "natural and probable consequences" jury instruction, and that the error was not harmless.

Convictions for aggravated murder and felony murder reversed and remanded; otherwise affirmed.