Argued and submitted August 18, 2010, convictions on Counts 1, 2, and 4
reversed and remanded; case remanded for resentencing;
otherwise affirmed March 16, 2011

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ANDREW AARON TUCKER,
*Defendant-Appellant.*

Malheur County Circuit Court
08031165C2; A140357

251 P3d 224

Jesse W. Barton argued the cause for appellant. On the brief was Charles M. Simmons.

Denis M. Vannier, Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Rosenblum, Judge.

WOLLHEIM, J.

## WOLLHEIM, J.

Defendant appeals his convictions for robbery in the second degree, ORS 164.405, burglary in the first degree, ORS 164.225, burglary in the second degree, ORS 164.215, and aggravated theft in the first degree, ORS 164.057. On appeal, defendant raises three assignments of error. First, he asserts that the trial court erred in giving a "natural and probable consequences" jury instruction addressing accomplice liability. Second, defendant contends that, because he was not "actually present" when the robbery took place, he could be convicted, at most, of only third-degree robbery and that the trial court erred in denying his motion for judgment of acquittal on the charge of robbery in the second degree after first granting the motion. Finally, defendant argues that the trial court abused its discretion in denying his motion for leave to contact the jurors. Following our recent decision in *State v. Lopez-Minjarez*, 236 Or App 270, 237 P3d 223, *modified on recons*, 237 Or App 688, 240 P3d 753 (2010), we conclude that the trial court erred in giving the "natural and probable consequences" jury instruction, and that the error probably affected the jury verdict. Accordingly, we reverse and remand Counts 1, 2, and 4. However, because we conclude that the evidence was overwhelming as to defendant's guilt of burglary in the second degree (Count 3), we affirm defendant's conviction on that count. With regard to the remaining assignments of error, we conclude that the trial court did not err.

Except as otherwise noted, we state the facts in the light most favorable to the state because defendant was convicted of the charged offenses. *State v. Viranond*, 346 Or 451, 453, 212 P3d 1252 (2009). Zachariah Vitale and Rocky Vitale are cousins.[1] Rocky worked for defendant, who lived in Idaho and was reputed to be affiliated with "a mild version of the mob" there. In November 2007, defendant told Rocky to rob a specific house in Boise, Idaho. The owner of the house, Santy, owed defendant some money for poker, and defendant wanted Rocky to "hit" the house because Santy was playing poker in defendant's area. Rocky and Zachariah robbed the

---

[1] Because the Vitales share the same last name, we refer to them by their first names.

house and took Santy's pool cues, worth approximately $1,200 to $1,300, as well as a car owned by Santy's friend. The Vitales and defendant agreed that half of the money would go to defendant and the Vitales would split the remainder.

Later, defendant met with Rocky and Moui Mercer Stone to discuss additional potential targets to rob. At this point in the narrative, the state's version of the facts differs from defendant's; the state and defendant disagree on defendant's level of involvement in planning two burglaries. The state's theory is that Stone suggested the Vitales "hit" two additional houses, the Sullivan house and the Murakami house, and that defendant planned both burglaries with the Vitales and Stone. Defendant's theory is that, although he helped plan the Sullivan burglary, he was not involved in planning the Murakami burglary.

On November 21, 2007, the Vitales met with Stone at a restaurant in Ontario and Stone drove them by the Sullivan house. The Vitales attempted to rob that house, which turned out to be empty. The Vitales returned to the restaurant and called Stone. They also tried to call defendant, but were unable to reach him. Stone then took the Vitales to the Murakami house. Stone told them that there was an old lady who lived there by herself and she had money and jewelry. Stone specifically told them to make sure to get Murakami's wedding ring.

Rocky and Zachariah entered the Murakami house through the garage. Murakami was asleep when the two men entered her bedroom. Rocky told her to go down to the basement and bring up the money. Murakami told him that all of her money was in the bank. Rocky threatened to kill Murakami if she did not give him her money and he threatened to kill her dog if the dog did not stop barking. The Vitales ransacked the house, put Murakami's property in a plastic sack and made her take off her wedding ring (valued at $28,900), and put it in the sack as well. The Vitales put Murakami in the bathroom and secured the door closed. After the Vitales left, Murakami escaped and drove to the police station.

Meanwhile, the Vitales drove to Nyssa, where an officer stopped their vehicle because one of the tail lights was out. At that time, Rocky was driving. The officer impounded the car because Rocky did not have a valid license. Rocky told the officer that the property in the back of the car belonged to a friend's grandmother, whom they were helping move. The officer gave Rocky and Zachariah a ride to a nearby town in Idaho. Rocky called defendant several times, but defendant did not answer. Shortly thereafter, the officer heard a radio dispatch describing the burglary and became suspicious about the car he had impounded. The officer met with Murakami's daughter, who was able to identify the property through the windows of the car.

The next morning, the Vitales met with defendant and Stone to discuss how to get the car out of impound. Defendant suggested that the Vitales go to Stone Island in Mexico to hide out. The Vitales tried to flee to Mexico, but were caught by the police in Nevada. After his arrest, Rocky informed the police about defendant's involvement in the burglaries. Defendant was charged with robbery in the second degree of Murakami (Count 1), burglary in the first degree of the Murakami house (Count 2), burglary in the second degree of the Sullivan house (Count 3), aggravated theft in the first degree of Murakami's property (Count 4), and four counts of criminal conspiracy.

At trial, the state's theory was that defendant was guilty of all of the charged offenses as an accomplice. Rocky, Zachariah, Stone, and the officer testified. There was testimony to support defendant's and the state's theories about defendant's level of involvement in the burglaries. The testimony supporting defendant's theory was as follows: Stone testified that defendant and she did not plan the robberies. She also said that, when she suggested robbing the Sullivan and Murakami houses to defendant, she meant it as a joke, and that defendant was not in the car when she showed the Vitales the Sullivan and Murakami houses.

However, in support of the state's theory and inconsistent with her other testimony, Stone also testified that the Vitales worked for defendant and that defendant asked her to find some places to burglarize. Zachariah testified that he

did not discuss the burglaries with defendant, and defendant did not tell him what to do, though he did take instructions from Rocky. Rocky testified that defendant did not know about the Murakami burglary. But Rocky also testified that, before the Sullivan burglary, "[defendant's] friend [Stone] needed help collecting and that I was going to go and collect for her." Rocky said there was no doubt that the kind of "collecting" would be the same as the collecting he had done at Santy's house, that is, robbery. Rocky testified that he discussed robbing "the Sullivans and some other people" with defendant and Stone.

After the conclusion of the state's case, defendant moved for a judgment of acquittal on all counts. The court initially granted defendant's motion for a judgment of acquittal on the second-degree robbery charge, but after further colloquy, the court reversed that ruling. The court granted defendant's motion for judgment of acquittal on the conspiracy counts.

The state asked the court to give the following instruction:

"A person who aids and abets another in committing a crime, in addition to being criminally responsible for the crime that is committed, is also criminally responsible for any acts or other crimes that are committed as a natural and probable consequence of the planning, preparation or commission of the alleged intended crime or crimes.

"The accomplice is not liable if the other participant or participants acted outside the purpose of the criminal scheme."

Defendant took exception to the "natural and probable consequences" jury instruction. In response, the prosecutor argued,

"I need to * * * be able to argue the natural and probable consequences [were that] they intended to go to the Sullivan house to commit robbery and burglary in the first degree, because they thought it was someone's home. And the natural and probable consequence when you put that in motion and someone's moved out of their house is that they're going to need to continue to do the robbery and the burglary."

Defendant responded that the "natural and probable consequences" instruction relieved the state of its burden to prove that defendant intended the crimes be committed and instead "invit[ed] the jury to consider what crimes the defendant probably believed would be committed." Nonetheless, the court gave the "natural and probable consequences" jury instruction.

The jury found defendant guilty of robbery in the second degree (Count 1), burglary in the first degree (Count 2), burglary in the second degree (Count 3), and aggravated theft in the first degree (Count 4). Three of the four convictions—Counts 1, 2, and 4—related to the Murakami burglary and theft.

## I. "NATURAL AND PROBABLE CONSEQUENCES" JURY INSTRUCTION

Defendant asserts that the trial court erred in giving the jury the "natural and probable consequences" instruction. "We review jury instructions as a whole and will reverse only if we can fairly say that the instructions probably created an erroneous impression of the law in the minds of the jurors that affected the outcome of the case." *Maas v. Willer*, 203 Or App 124, 129, 125 P3d 87 (2005), *rev den*, 340 Or 411 (2006). In *Lopez-Minjarez*, we held that the "natural and probable consequences" jury instruction affirmatively misstates the law with respect to accomplice or accessorial liability, that it "is not an accurate statement of the law and that it probably created an erroneous impression of the law in the minds of the jurors." 236 Or App at 286-87 Accordingly, we conclude that the court in this case erred in giving the "natural and probable consequences" instruction.

Thus, the remaining issue here is whether the incorrect jury instruction probably affected the outcome in this case. Defendant asserts that, as we held in *Lopez-Minjarez*, *id.* at 289, the error probably affected the jury verdict. The state argues that the facts of this case are distinguishable from those in *Lopez-Minjarez* and that, reading the jury instructions as a whole, there is little likelihood that the "natural and probable consequences" instruction affected the jury verdict. We agree with defendant.

In *Lopez-Minjarez*, the defendant was charged with burglary, assault, and murder. *Id.* at 276. The state's theory was that the defendant was directly involved in the crimes or, alternatively, that he was an accomplice on those charges. The court gave an instruction very similar to the one in this case, "Uniform Criminal Instruction No. 1052, 'Aider Or Abettor—Liability For Probable Consequences' ":

> "A person who aids or abets another in committing a crime, in addition to being criminally responsible for the crime that is committed, is also criminally responsible for any acts or other crimes that were committed as a natural and probable consequence of the planning, preparation, or commission of the intended crime."

*Lopez-Minjarez*, 236 Or App at 275. In closing argument, "the prosecutor highlighted the natural and probable consequences principle as a significant feature of accomplice liability." *Id.* at 277. We concluded that the trial court erred in giving the "natural and probable consequences" instruction, because the instruction is not an accurate statement of the law. *Id.* at 286.[2] We also rejected the state's "dilution" argument, that is, that the instruction probably did not affect the verdict because the court had properly instructed the jury on all of the elements of the crimes. We explained that, despite the other proper instructions, "the jurors reasonably could have convicted defendant of the homicides simply because they believed that the homicides were the natural and probable consequences of the earlier crimes. Yet, that is not the law." *Id.* at 288.

The state makes an argument here that is similar to the one we rejected in *Lopez-Minjarez*. The state first points out that the "natural and probable consequences" instruction in this case was different from the instruction in *Lopez-Minjarez*, because here it included an additional sentence: "The accomplice is not liable if the other participant or participants acted outside the purpose of the criminal scheme."

---

[2] Under ORS 161.155(2)(b), a person is liable for the conduct of another person if, "[w]ith the *intent* to promote or facilitate the commission of the crime," the person aids or abets another person in planning or committing the crime. (Emphasis added.) Nothing in the statute extends criminal liability to acts that are the "natural and probable consequences" of the act a defendant intended to aid and abet. *Lopez-Minjarez*, 236 Or App at 282.

However, that additional sentence did not correct the legal error in the "natural and probable consequences" instruction, which allows a jury to hold a defendant criminally liable not only for the crimes he intended to aid or abet, but for any other crime that the jury finds is a "natural and probable consequence" of the crimes the defendant aided and abetted. *See id.* at 282. Second, the state contends that, because the court correctly instructed the jury on the elements of each crime, the "natural and probable consequences" instruction probably did not affect the verdict, and that we should affirm because the evidence of defendant's guilt was overwhelming. We reject that contention with regard to the counts related to the Murakami burglary (Counts 1, 2, and 4).

As in *Lopez-Minjarez*, the jury in this case could have convicted defendant of the Murakami offenses on either of two theories: that defendant intended his accomplices to commit the Murakami crimes, or that he intended for them to commit the Sullivan burglary and, when that failed, he was liable for the Murakami crimes as a natural and probable consequence of the first crime. Viewed in the light most favorable to the state, the testimony at trial regarding whether defendant helped plan the Murakami burglary was equivocal at best. Stone testified that defendant and she did not plan the robberies. She also said that, when she suggested robbing the Sullivan and Murakami houses to defendant, she meant it as a joke, and that defendant was not in the car when she showed the Vitales the Sullivan and Murakami houses. Zachariah testified that he did not discuss the burglaries with defendant, and that defendant did not tell him what to do. Rocky testified that defendant did not help plan the Murakami burglary:

"[Prosecutor:]   Let me ask this: How far in advance of this robbery did you and [Stone] and the defendant come up with the plan to do these robberies?

"[Rocky:]   Uh, the Murakami's, no, but the Sullivans, yes. I don't think he could've known about the Murakamis, but you never know."

The Vitales also testified that they did not talk to defendant on the night of the burglaries and could not get in touch with him until the next morning.

The state points out that Stone also testified that the Vitales worked for defendant and that defendant asked her to find some places to burglarize. Rocky testified that before the Sullivan burglary, "[defendant's] friend [Stone] needed help collecting and that I was going to go and collect for her." Rocky said there was no doubt that the kind of "collecting" would be the same as the collecting he had done at Santy's house, that is, robbery. Rocky testified that he discussed robbing "the Sullivans and some other people" with defendant and Stone.

In sum, although there is some evidence that defendant intended for Stone, Rocky, and Zachariah to commit the Murakami burglary, that evidence is not overwhelming. The fact that the court gave the jury both the "natural and probable consequences" instruction and the correct instructions likely confused the jury about how it was supposed to consider the evidence. Accordingly, we conclude that the incorrect "natural and probable consequences" instruction probably affected the jury verdict on Counts 1, 2, and 4, and we reverse and remand on those counts.

■　　　However, we conclude that the evidence was overwhelming as to Count 3, burglary in the second degree of the Sullivan house, and that the erroneous instruction likely did not affect the verdict. Both Rocky and Stone testified that they planned the Sullivan burglary with defendant. Although Zachariah did not say that he discussed the Sullivan burglary with defendant, he testified that Rocky told him what to do, based on Rocky's conversations with defendant. Moreover, defendant's argument on appeal is that he was only involved in the planning of the original crime, that is, the Sullivan burglary. Thus, we affirm the conviction on Count 3, the Sullivan burglary.

## II. MOTION FOR JUDGMENT OF ACQUITTAL

Defendant asserts that because he was not "actually present" when the Murakami robbery took place, he could be convicted, at most, of only third-degree robbery. We considered and rejected the same argument in *State v. Smith*, 229 Or App 243, 249-50, 211 P3d 961 (2009), *rev den*, 348 Or 115

(2010), and therefore reject his assertion without further discussion.[3]

Defendant also contends that the trial court erred in denying his motion for judgment of acquittal on the charge of robbery in the second degree after first granting the motion. The state asserts that the trial court did not err in reconsidering defendant's motion, because defendant did not detrimentally rely on the order granting judgment of acquittal. We agree with the state.

■ Motions for judgment of acquittal are governed by ORS 136.445, which provides:

> "In any criminal action the defendant may, after close of the state's evidence or of all the evidence, move the court for a judgment of acquittal. The court shall grant the motion if the evidence introduced theretofore is such as would not support a verdict against the defendant. The acquittal shall be a bar to another prosecution for the same offense."

Defendant argues that when the trial court first granted his motion for judgment of acquittal, that was a bar to further prosecution for the same offense and, accordingly, the trial court erred in reversing its oral order.

We addressed that issue in *State v. Sperry*, 149 Or App 690, 945 P2d 546 (1997), *rev den*, 328 Or 275 (1999), which is analogous to this case. In *Sperry*, the defendant argued that, once the court granted his motion for a judgment of acquittal, "the trial court could not subsequently reverse itself and reinstate the count." *Id.* at 696. But we held that

> "an oral ruling allowing a motion for judgment of acquittal is not preclusive, and may be rescinded, where, as here, neither the parties nor the court have detrimentally relied on that ruling—*e.g.*, through presentation of arguments, introduction of evidence, or instruction or discharging of the jury—in the interval between the oral allowance and rescission."

---

[3] For the same reason, we also reject defendant's argument that the trial court erred in instructing the jury on the elements of robbery in the second degree.

*Id.* at 698. Here, as in *Sperry*, nothing substantive occurred between the court's oral ruling granting the motion and its reversal of that ruling and, therefore, we conclude that the trial court did not err in reinstating the count.

Relying on *Smith v. Massachusetts*, 543 US 462, 125 S Ct 1129, 160 L Ed 2d 914 (2005), defendant argues that the trial court violated state and federal constitutional double jeopardy protections by reinstating the count of robbery in the second degree after first granting his motion for judgment of acquittal. Defendant's reliance on *Smith* is misplaced. In *Smith*, after the trial court granted a motion for acquittal, the trial proceeded to the defendant's presentation of his case. It was only after the defendant had presented his case that the trial court reinstated the dismissed count. The Supreme Court held that the defendant was prejudiced because "[t]he seeming dismissal may induce a defendant to present a defense to the undismissed charges when he would be better advised to stand silent." *Id.* at 472. Here, there was no similar possibility of prejudice, and accordingly, no error.

### III. MOTION TO CONTACT THE JURORS

Finally, defendant asserts that the trial court abused its discretion in denying his motion for leave to contact the jurors after trial. We review a court's decision to deny a post-trial motion to contact jurors for abuse of discretion. *State v. Wright*, 323 Or 8, 20, 913 P2d 321 (1996).

Five months after the trial, an alternate juror approached defendant's counsel in a store and told him that she was concerned that one of the jurors had not based his decision on evidence in the record. The alternate juror reported that the juror said he thought defendant "was guilty because his haircut made it clear [that] he was a Mafioso." Defendant asked the court for leave to contact the jurors to investigate whether misconduct had occurred. The state argued that the conduct was not sufficient to intrude on the jury verdict. The court found that defendant had not shown that the juror's misconduct had deprived defendant of a fair trial, and it denied the motion to contact the jurors.

Under UTCR 3.120(2)(b), a party may have contact with a juror if "there is a reasonable ground to believe that a

juror or the jury has been guilty of fraud or misconduct sufficient to justify setting aside or modifying the verdict or judgment."[4] However, "[t]here is a strong policy in Oregon to protect jury verdicts from attack, and courts are hesitant to interrogate jurors after they have reached a verdict in order to probe for potential misconduct." *Koennecke v. State of Oregon*, 122 Or App 100, 103, 857 P2d 148, *rev den*, 318 Or 26 (1993).

We agree with the trial court that the evidence that a juror said he thought defendant was guilty because of his haircut was not a sufficient basis on which to believe that the juror was guilty of fraud or misconduct so as to justify setting aside or modifying the verdict. Accordingly, we conclude that the trial court did not abuse its discretion in denying defendant's motion to contact the jurors.

Convictions on Counts 1, 2, and 4 reversed and remanded; case remanded for resentencing; otherwise affirmed.

---

[4] UTCR 3.120 provides, in part:

"(1) Except as necessary during trial, and except as provided in subsection (2), parties, witnesses or court employees must not initiate contact with any juror concerning any case which that juror was sworn to try.

"(2) After a sufficient showing to the court and on order of the court, a party may have contact with a juror in the presence of the court and opposing parties when:

"* * * * *

"(b) there is a reasonable ground to believe that a juror or the jury has been guilty of fraud or misconduct sufficient to justify setting aside or modifying the verdict or judgment."