Submitted May 23, reversed and remanded July 9, 2008

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

LARRY DANIEL PERKINS,
*Defendant-Appellant.*

Coos County Circuit Court
05CR1108; A130361

188 P3d 482

Daniel J. Casey filed the brief for appellant.

Larry Daniel Perkins filed the supplemental brief *pro se.*

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Paul L. Smith, Assistant Attorney-in-Charge, Criminal Appeals, filed the brief for respondent.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Rosenblum, Judge.

HASELTON, P. J.

**HASELTON, P. J.**

Defendant appeals from his conviction, following a jury trial, of driving under the influence of intoxicants (DUII), ORS 813.010(1)(b). He assigns error to, *inter alia*, the denial of his motion to suppress a thermos-like coffee cup, containing an alcoholic beverage, that was found between the driver and passenger seats during a post-impoundment inventory of his truck. The state acknowledges that, in light of *State v. Eldridge*, 207 Or App 337, 142 P3d 82 (2006), the inventory was invalid, rendering the seizure of the container unlawful under Article I, section 9, of the Oregon Constitution. The state contends, nevertheless, that the denial of suppression, and the consequent admission at trial, of the coffee cup and testimony concerning its contents, was harmless error, given the totality of the evidence at trial. As explained below, we cannot say that, notwithstanding the erroneous admission of evidence that defendant had been driving with an open container of alcohol within reach, there was "little likelihood" that that evidence affected the jury's verdict convicting defendant of DUII. *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). Accordingly, we reverse and remand.

The facts material to our consideration are undisputed. On June 10, 2005, at about 8:45 p.m., North Bend Police Officer John Bohanan saw defendant driving, with a passenger, in a pickup truck.[1] Bohanan, who was driving in the opposite direction, circled around and pulled up behind the pickup as it stopped at a red light. After stopping, defendant then drove through the intersection while the traffic light was still red. Bohanan followed, activating the overhead lights on his patrol car, and defendant immediately pulled over, in routine fashion, within a quarter of a block.

When Bohanan approached the pickup, he asked defendant to produce his driver's license and other documents, but defendant was unresponsive, gripping the steering wheel and staring straight ahead. At the same time, Bohanan smelled a "moderate" "odor of an alcoholic beverage" coming from the pickup and observed that defendant's eyes were "watery and glassy." Defendant's eyes were not,

---

[1] Bohanan had earlier "talked to [defendant about] another issue."

however, bloodshot and "his speech was fair" and not "noticeably slurred."

Bohanan learned from a records check that defendant had been driving while suspended and decided to take him into custody. Consequently, Bohanan asked defendant to get out of the pickup. As defendant did so, Bohanan could smell alcohol on defendant's breath, but did not observe anything unusual about defendant's balance. Bohanan believed that defendant might be under the influence of intoxicants and read defendant his *Miranda* rights before placing him in the patrol car and driving him back to the police station to continue the DUII investigation, including performance of field sobriety tests.

At some point before taking defendant back to the police station—and it is unclear whether before or after reading defendant his *Miranda* rights—Bohanan determined that the pickup must be impounded and its contents inventoried in accordance with North Bend city policies. During the inventory, Bohanan found, in the area between the driver's and passenger's seats, a "thermos, almost like a coffee cup, traveling coffee cup with a slider where you could sip from." That receptacle, which was within defendant's reach, gave off a "strong odor of maybe a liquor beverage" and was less than half-full of some sort of liquid.[2]

After Bohanan took defendant to the police station, defendant voluntarily performed a variety of "standardized" and "nonstandardized" field sobriety tests. The "standardized" tests were the horizontal gaze nystagmus (HGN) test, the "walk-and-turn" test, and the "one-leg stand" test. On the HGN test, defendant showed a "lack of smooth pursuit in both eyes" and a "distinct and sustained nystagmus" in both eyes, which indicated impairment. On the "walk-and-turn" test, defendant failed that test because he did not maintain his balance initially, started the test too soon, "missed heel to toe" on one of his first set of 10 steps, and, on his returning set of steps, missed "heel to toe" several times, "stepped off line," and raised his arms for balance. Defendant also failed the

---

[2] There is no indication in the record that the state, after seizing the container, ever tested or otherwise confirmed the precise nature of its contents.

"one-leg stand" test by noticeably swaying, twice putting his foot down, and concluding the test a few seconds before the prescribed 30-second period.

Bohanan then administered a variety of "nonstandardized" field sobriety tests. On the "estimated passage of time" test, on which defendant was instructed to stand with his head leaning back and eyes closed and to estimate the passage of 30 seconds, defendant, although exhibiting some circular swaying, indicated after 28 seconds that 30 seconds had passed—which was well within the "normal range for a person that would be given this test." On the "backwards count" test, defendant's only error was in counting backwards in correct sequence from 100 to 75, instead of to 77, as instructed. Finally, on the "alphabet" test, defendant correctly recited the alphabet, without singing or rhyming, from "A" to "P," paused for a moment—and then, when prompted with "Q" by his passenger who was observing—correctly recited the balance of the alphabet.

After completing both the "standardized" and "nonstandardized" field sobriety tests, Bohanan determined that defendant had "failed by standardized field sobriety test" and that defendant had been driving under the influence of intoxicants. At Bohanan's request, defendant then consented to an Intoxilyzer test. That test, given at 10:00 p.m., approximately one hour and 15 minutes after the traffic stop, showed that defendant had a .07 blood alcohol level.

Before trial, defendant sought to suppress evidence pertaining to the "coffee cup" containing an alcoholic beverage found during the inventory of his pickup, arguing, in part, that "such evidence was discovered pursuant to an illegal inventory." The trial court denied that motion.

At trial, the prosecutor, in his opening statement, referred to Bohanan's discovery of a "mug type container that has [an] alcoholic beverage in it * * * between the seats, close to where the defendant is sitting." The only witness at trial was Bohanan, and, after Bohanan testified regarding the circumstances of the stop, the prosecutor elicited detailed testimony from him (summarized above) regarding the discovery of the "coffee cup," its location, and its contents. The prosecutor then offered, and the court received, the "coffee cup"

(which no longer contained any liquid) as "State's Exhibit No. 1."

The balance of Bohanan's testimony pertained to defendant's performance on the field sobriety tests, the Intoxilyzer result, and Bohanan's assessment of defendant's impairment. In particular, and as pertinent to defendant's second assignment of error on appeal, Bohanan gave the following testimony to which defendant unsuccessfully objected:

"Q.  So, once all the tests were done, what was your assessment of the Defendant's overall performance on the field sobriety tests?

"A.  My observations [were] that he failed by standardized field sobriety test and that I believed him to be operating a motor vehicle under the influence of intoxicants to a noticeable and perceptible degree."

In closing argument, the prosecutor again referred to the "coffee cup"-related evidence as significant:

"[T]hey looked through the vehicle, they find the cup. It was found in the vehicle between the seats in reach of the Defendant with alcohol[ic] beverage in it. Another indicator. We never heard anything from Officer Bohanan about seeing him throwing it back or seeing him drink it, but it's evidence that you can consider as to whether the Defendant was under the influence."

The jury, by an 11-1 verdict, found defendant guilty of DUII.

On appeal, defendant raises two assignments of error. First, he reiterates his contention that the "coffee cup"-related evidence should have been suppressed because the predicate inventory was unlawful either under Article I, section 9, of the Oregon Constitution or the Fourth Amendment to the United States Constitution. Defendant further argues that, given the totality of the evidence regarding defendant's degree of impairment, the erroneous admission of evidence that defendant had been driving with an open container of an alcoholic beverage within reach cannot be deemed harmless error. Second, as before the trial court, defendant contends that Bohanan's testimony (quoted above) regarding his assessment of defendant's impairment was improper "either

as a legal conclusion or because it pertained to an ultimate fact that was not beyond the jury's ability to decide for itself."

With respect to defendant's first assignment of error, the state acknowledges that, given *Eldridge*—which issued nearly a year after the trial here—the inventory was unlawful under Article I, section 9. *See Eldridge*, 207 Or App at 343 ("[T]he North Bend inventory program lacks standardized criteria or procedures that properly prevent officer discretion and limit each inventory to a scope that is a constitutional administrative action rather than an unlawful warrantless search."). However, the state contends that that state constitutional error was harmless because there was "little likelihood that the particular error affected the verdict." *Davis*, 336 Or at 32. The state further disputes defendant's alternative contention that the inventory violated the Fourth Amendment and asserts that, even if there was federal constitutional error, the admission of the "coffee cup"-related evidence was "harmless beyond a reasonable doubt." *Chapman v. California*, 386 US 18, 24, 87 S Ct 824, 17 L Ed 2d 705, *reh'g den*, 386 US 987 (1967). Finally, with respect to the second assignment of error, the state responds that Bohanan's testimony was properly admitted and, in all events, any asserted error was harmless because Bohanan later—and without any objection or derivative assignment of error by defendant—"provided a more expansive opinion of defendant's sobriety."

We accept as well-founded the state's acknowledgment that, given *Eldridge*, the admission of the "coffee cup"-related evidence was erroneous under Article I, section 9. Further, as explained below, we do not agree with the state that there was "little likelihood" that the "coffee cup"-related evidence affected the jury's verdict. That is so, regardless of the admissibility of Bohanan's testimony that is the object of the second assignment of error.[3] Accordingly, because the admission of the "coffee cup"-related evidence was not harmless error, we reverse and remand.[4]

---

[3] Consequently, we need not, and do not, address that assignment of error.

[4] Given our analysis and disposition, we do not address the parties' arguments, including those raised in the *pro se* supplemental appellant's brief, as to whether the inventory was lawful under the Fourth Amendment.

*Davis* frames the inquiry. There, the trial court, in a murder prosecution, excluded evidence that the defendant sought to present regarding the alleged victim's possible motivation to commit suicide. 336 Or at 23-25. The Supreme Court, in reversing the defendant's conviction, determined that the exclusion of that evidence was error, *id.* at 27, and that that error required reversal because it was not "harmless." *Id.* at 28-35. In so holding, the court clarified that, under Article VII (Amended), section 3,[5]

> "Oregon's constitutional test for affirmance despite error consists of a single inquiry: Is there little likelihood that the particular error affected the verdict? The correct focus of the inquiry regarding affirmance despite error is on the possible influence of the error on the verdict rendered, not whether this court, sitting as a factfinder, would regard the evidence of guilt as substantial and compelling."

*Id.* at 32.

The Supreme Court further explained that a variety of considerations may properly inform that "single inquiry," including "the nature of the error that occurred below," *id.*, and the "context of the legal error." *Id.* at 33. The court noted, for example, that the erroneous exclusion or admission of evidence would be harmless "if the particular issue to which the error pertains has no relationship to the jury's determination of its verdict," *id.* at 32, or if the jury "would have regarded the * * * evidence as duplicative or unhelpful to its deliberations." *Id.* at 33. Ultimately, the Supreme Court in *Davis* concluded that the erroneous exclusion was not harmless, because it could not "say that the excluded statements were merely cumulative of" admitted evidence—and, indeed, "were qualitatively different than the evidence that the jury heard"—and because "the excluded evidence goes directly to the heart of defendant's factual theory of the case." *Id.* at 34.

This case is the functional obverse of *Davis* in that it involved the erroneous admission of evidence presented by

---

[5] Article VII (Amended), section 3, provides, in part:

"If the supreme court shall be of opinion, after consideration of all the matters thus submitted, that the judgment of the court appealed from was such as should have been rendered in the case, such judgment shall be affirmed, notwithstanding any error committed during the trial[.]"

the state, rather than the erroneous exclusion of evidence that a criminal defendant sought to present. But the considerations bearing on the "single inquiry" are, of course, the same.

The state, for its part, attempts to cast the "coffee cup"-related evidence as "merely cumulative" of other evidence as to a largely uncontroverted issue:

> "First, the coffee cup evidence proved nothing new to the jury. The ultimate factual issue that the jury needed to decide was whether defendant was intoxicated to a noticeable and perceptible degree. The coffee cup was offered only to demonstrate the presence of alcohol near defendant. There is no dispute that defendant drank alcohol that night. Defendant was found to have a .07 BAC an hour and fifteen minutes after he was pulled over, arrested, conducted six field sobriety tests, and waited an additional fifteen minutes. Those results were admitted into evidence. All that the coffee cup evidence demonstrated was that Officer Bohanan located a potentially alcoholic beverage in defendant's vehicle. There was no evidence presented that defendant drank from that coffee cup, or that the passenger did not drink from the coffee cup."

The state also contends that there was very substantial evidence of defendant's culpable impairment, including that defendant ran a red light with a police car stopped behind him, that defendant had glassy and watery eyes and smelled of alcohol, that defendant failed various field sobriety tests, that defendant had a .07 blood alcohol content more than an hour after the stop, and that Bohanan, an experienced officer, regarded defendant as impaired to a noticeable and perceptible degree.

Defendant rejoins that, at the time of the stop, his speech was not slurred, that his eyes were not bloodshot, that, when defendant got out of his pickup, Bohanan noticed nothing unusual about his balance, that he performed well on the "nonstandardized" field sobriety tests, specifically including the "time estimation" and "backwards counting" tests, that his performance on the "standardized" tests, while deemed a failure, was not egregious, and that his "breathalyzer result was only a .07."[6]

---

[6] The state did not present evidence as to the possible effect of the passage of approximately one hour and 15 minutes on defendant's blood alcohol level.

We cannot say that, in these circumstances, there was "little likelihood" that the "coffee cup"-related evidence affected the jury's verdict—and, particularly, its determination that defendant's faculties were impaired, because of the consumption of an alcoholic beverage, to a noticeable or perceptible degree. Although the state now casts that evidence as pertaining solely to the essentially undisputed issue of whether defendant had consumed an alcoholic beverage, that does not square with its use of that evidence at trial. Rather, after highlighting the location and contents of the "coffee cup" in opening statement and in the direct examination of Bohanan, the prosecutor explicitly invited the jury to rely on that evidence as "[a]nother indicator * * * that you can consider as to whether the Defendant was under the influence." Thus, at least as argued by the state to the jury, the "coffee cup"-related evidence went "directly to the heart of [the state's] factual theory of the case." *Davis*, 336 Or at 34.

Further, that evidence was not "merely cumulative of [the admitted] evidence," *id.*; indeed, as a practical matter, it was "qualitatively different than the [other] evidence that the jury heard." *Id.* The presence of an open container of alcohol within the defendant driver's reach can be the quintessential "smoking gun" in a DUII prosecution. It is unsurprising, given the potential visceral impact of such evidence on jurors, that the prosecution here featured the coffee cup (albeit empty) as "State's Exhibit No. 1."

Finally, we decline the state's implicit invitation to assess the persuasiveness of its other evidence pertaining to the degree of defendant's impairment. *See Davis*, 336 Or at 32 (in determining whether error is "harmless," appellate court must not "engage improperly in weighing the evidence and, essentially, retrying the case, while disregarding the error committed at trial, to determine whether the defendant is guilty"). Rather, our function is properly, constitutionally limited to determining whether, given the nature of the erroneously admitted evidence and its relationship, as framed by the parties' presentations, to the matters essential to the jury's verdict, there was "little likelihood" that that evidence affected the verdict. *Id.* We cannot so determine here. Accordingly, the court's admission of the "coffee cup"-related evidence was reversible error.

Reversed and remanded.