Submitted November 27, 2012, conviction for second-degree assault reversed and remanded; remanded for resentencing; otherwise affirmed March 6, 2013

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## TIMOTHY LEON PAINTER, II,
*Defendant-Appellant.*

Clatsop County Circuit Court
101001; A146873

300 P3d 179

Peter Gartlan, Chief Defender, and Susan Fair Drake, Senior Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

John R. Kroger, Attorney General, Anna M. Joyce, Solicitor General, and Pamela J. Walsh, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Haselton, Chief Judge, and Sercombe, Judge.

HASELTON, C. J.

**HASELTON, C. J.**

Defendant, who was convicted of assault in the second degree, ORS 163.175,[1] appeals, assigning error to the trial court's admission of statements that he made in recorded telephone conversations from jail after his arrest.[2] Defendant contends that the content of those statements was inadmissible in that it did not pertain to any "noncharacter" purpose. *See* OEC 404(3). We agree and, further, determine that the error was not harmless. Accordingly, we reverse and remand.

The circumstances material to our review of the asserted evidentiary error are not in dispute. Defendant was charged with a variety of offenses, including second-degree assault, arising from an encounter with police on January 3, 2010. The gravamen of the second-degree assault charge was that defendant had knowingly caused physical injury to Warrenton Police Officer Richard Kraynak by ramming his car into Kraynak's police cruiser as he was attempting to flee and elude police. The theory of the defense, as ultimately presented at trial, was that *Kraynak's* police car had struck *defendant's* car—or, at least, that defendant had not deliberately caused any collision.

Defendant was arrested immediately after the incident and lodged in the Clatsop County Jail. While incarcerated, defendant made a number of telephone calls to his mother and sister, which jail staff recorded. Those conversations are the object of our consideration. A complete reproduction of the proffered excerpts of those conversations

---

[1] ORS 163.175, as pertinent here, provides:

"(1) A person commits the crime of assault in the second degree if the person:

"\* \* \* \* \*

"(b) Intentionally or knowingly causes physical injury to another by means of a deadly or dangerous weapon[.]"

As described below, 255 Or App at 519, defendant also was acquitted of charges of assaulting a public safety officer, ORS 163.208, and criminal mischief in the first degree, ORS 164.365. Defendant pleaded guilty to other charges and does not challenge those convictions.

[2] Defendant also assigns error to an aspect of the sentence imposed on the conviction for second-degree assault. Given our disposition, we do not address that matter (on which the state concedes error).

would be of no benefit to the bench, the bar, or the public. In general, defendant (a) told his mother and sister that Kraynak (whom he characterized in obscene terms) had fabricated his account of the episode and that other officers (whom he also characterized in obscene terms) had collaborated in that fabrication, and (b) vowed and threatened to take revenge (again, in the most lurid terms) against the officers if he was convicted.

For example, notwithstanding his mother's admonitions during one call that the conversations were being recorded, defendant responded, "I don't give a fuck. Let them play this in my trial. They send me to prison when I'm innocent to something and they will fucking pay. *** They will fucking pay dearly." In another of the conversations, defendant, reiterating his rage for "sitting in jail facing prison time for something I didn't fucking do"—and that "[t]he police know it"—threatened to "shove [Kraynak's] badge right up his *** asshole" and to "fucking cave his fucking head in." And, in a final conversation with his mother, defendant vented his rage at police for holding him in jail while a loved one experienced a medical emergency:

"[DEFENDANT]: Do you have any fucking idea what I would do to every fucking motherfucking law enforcement in this county if my girl dies while I'm in here? Any fucking idea what I'll do? They'll put me on death row, I'll tell you that much.

"* * * * *

"[DEFENDANT]: They'll put me on death row, I'll go crazy ***.

"* * * * *

"[DEFENDANT]: I fucking hate every goddamn cop, every motherfucker with a badge.

"[DEFENDANT'S MOTHER]: Tim, it's not their fault, okay. It's the officer that arrested you and lied.

"[DEFENDANT]: It is their fault. It's all of them, it's all of them.

"[DEFENDANT'S MOTHER]: Tim, they weren't there.

"[DEFENDANT]: They're keeping me held in here based on his fucking lies. It's all of them."

Before trial, the state sought a ruling on the admissibility of both a CD, and a series of transcripts, of the excerpted conversations. The state argued that the content of those proffered exhibits was relevant for two distinct purposes:

"[The first is] statements about what he did that night, admissions as to the property crimes [to which] he has already entered guilty pleas[,] and statements about the actual collision that is the basis of Counts 1 [the second-degree assault charge] and 2 [the assault on a public safety officer charge].

"In other phone calls, or other portions of phone calls, he made statements that are to be threatening statements about Officer Kraynak and police officers in general—those involved in this case in general, and it's the State's position that all of these are relevant."

With respect to the second category—*viz.*, defendant's threatening statements, the state asserted that "those are admissible as they go to [defendant's] motive and intent that night." In particular, the prosecutor asserted:

"[T]hey very clearly show animus on the part of [defendant] towards Officer Kraynak specifically and police officers in general. I think one of the State's [exhibits] references 'All'—expletives—'with a badge.' And so I think they are relevant to show that animus, that intent.

"The fact that these are statements that happen after the crimes I don't think is relevant to its admissibility. Certainly, it's something [defendant] can argue—[defendant] can argue as to how much weight they should be [given by] the jury, but I don't think it bears on the admissibility of the evidence because it still shows the animus of [defendant] towards the victim of this crime."

Defense counsel responded first with a generic hearsay objection (which defendant does not renew on appeal) and then focused on defendant's principal argument, *viz.*, that the obscene, threatening statements were inadmissible"character evidence":

"So my concern is that these calls and all the rest of the calls that [make] up the subject matter are not the pattern [of] hatred of law enforcement but that he feels that he's being framed by the local law enforcement officers[.] * * *

"*** There's a lot of foul language and it's really—it's called relevant, but it's really character evidence masked as relevant information.

"* * * * *

"In this case all these statements are in frustration about a prosecution; he doesn't feel this should be going forward; and it's after the incident.

"So the State is arguing that he's predisposed to hating cops because he's saying after the incident, while he's in custody feeling that he's being framed, that he hates all the cops and he says, 'All the cops here.'"

The trial court, without expressing its reasoning, ruled that the CD and transcripts were admissible.

The case proceeded to trial on three charges—*viz.*, second-degree assault, assaulting a public safety officer,[3] and criminal mischief in the first degree.[4] The state, in its case-in-chief, submitted, without further argument or objection, the CD recording and transcribed excerpts of the recorded conversations, and the CD was played to the jury.[5]

Ultimately, the dispute at trial focused on whether defendant had rammed Kraynak's police cruiser—or whether Kraynak had struck defendant's car—and, if the former, whether defendant had acted with a culpable mental state. Kraynak and defendant rendered irreconcilable accounts, and defendant also presented the testimony of an accident reconstruction expert, who concluded that the damage to the vehicles "is not consistent with a deliberate attempt to ram the police vehicle and cause damage to that vehicle and

---

[3] ORS 163.208(1), as pertinent here, provides:

"A person commits the crime of assaulting a public safety officer if the person intentionally or knowingly causes physical injury to the other person, knowing the other person to be a peace officer, *** and while the other person is acting in the course of official duty."

[4] ORS 164.365(1), as pertinent here, provides:

"A person commits the crime of criminal mischief in the first degree who, with intent to damage property, and having no right to do so nor reasonable ground to believe that the person has such right:

"(a) Damages or destroys property of another[.]"

[5] Defendant subsequently testified about the recorded conversations, acknowledged that he "lik[ed] to talk a lot of crap *** when I get mad," and denied that he ever intended to follow through on the threats.

potential injury to the occupant." In addition, defendant testified that he did not recognize Kraynak's vehicle to be a police car until after the collision, and adduced other evidence circumstantially corroborating that perception.[6]

In rebuttal closing argument, the prosecutor—who had not referred to the conversations during his initial closing—highlighted them as evincing defendant's culpable mental state at the time of the January 3 incident:

"[With respect to] the threats that you heard made against Officer Kraynak, the threatening language made against [everyone] with a badge, and how he hates every person with a badge. The reason the State offered those, Ladies and Gentlemen, is not to say that [defendant] is a bad guy. * * *

"So we're not offering those to paint him in a bad light, [but] we're offering them because they give you insight into his mind close in time to when this happened. You'll see the dates on those, they range from * * * three days after the incident to about two weeks after the incident. I think that gives you a very, very clear insight into [defendant's] mind, what he was thinking about at the time of this incident * * *."

The jury convicted defendant of second-degree assault but acquitted him of assaulting a public safety officer and second-degree criminal mischief.

On appeal, defendant, invoking OEC 404(3),[7] reiterates that the trial court erred in admitting defendant's threatening statements in the recorded telephone conversations. Defendant further asserts that, given the centrality of his mental state and the prosecutor's emphasis in closing on the threatening statements as evincing a culpable mental state, the admission of those statements cannot be deemed harmless.

---

[6] For example, the collision occurred at approximately 3:30 a.m., and Kraynak did not activate his vehicle's red and blue lights until after the collision. Instead, Kraynak had activated only the vehicle's white overhead lights.

[7] OEC 404(3) provides:

"Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

The state remonstrates that "[t]he statements had a tendency to show that defendant knowingly rammed his car into the police cruiser on the night of the crime. At a minimum, the statements slightly increased the probability that defendant acted with the requisite mental state." Moreover, in the state's view, any error as to the admission of those statements was harmless because (however vehemently expressed) they conformed with defendant's position that he had been falsely accused.

The question of admissibility warrants only brief discussion. We agree with defendant that the trial court erred.[8] Contrary to the state's assertion, the only reasonable reading of defendant's threatening statements, individually and collectively, is that they evince, and were exclusively the product of, defendant's anger as a result of his arrest and subsequent events. Defendant repeatedly and, in context, consistently related his threats against Kraynak and the police generally to his perception that Kraynak had fabricated his account and his frustration at being unjustly accused: "They send me to prison when I'm innocent to something and they will fucking pay"; "I fucking hate every goddamn cop, every motherfucker with a badge. * * * They're keeping me held in here based on his fucking lies. It's all of them."[9]

Or, stated conversely, nothing in defendant's threatening statements can plausibly be understood to evince a hostility against the police that antedated the January 3 incident and, thus, was probative of his state of mind as of the time of the collision. That is, nothing in the statements even (in the state's phrasing) "slightly increased the probability that defendant acted with the requisite mental state." *Accord State v. Klamert*, 253 Or 485, 488, 455 P2d 607 (1969) (holding that threatening statement the defendant made

[8] To be sure, defendant could have preserved the asserted error with greater particularity before the trial court. For example, defendant did not specifically distinguish among various conversations or, for the most part, among portions of those conversations. However, the trial court was fairly alerted to defendant's fundamental contention that, within any given conversation and across the conversations collectively, the threatening statements should be excised as inadmissible "character evidence." *See generally Peeples v. Lampert*, 345 Or 209, 219-23, 191 P3d 637 (2008) (generally describing rationales for preservation requirement).

[9] Defendant also expressed threats based on his perceptions that Kraynak had stolen some of his personal property in the wake of the January 3 incident.

expressing animus against police several weeks before he shot a police officer was admissible in prosecution for that shooting). Accordingly, the threatening statements were inadmissible.[10]

The more challenging inquiry is whether, in the totality of the circumstances of this case, that error requires reversal of defendant's conviction for second-degree assault. In *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003), the court described the standard, under Article VII (Amended), section 3, of the Oregon Constitution[11] for reversing on the basis of evidentiary error:

> "Oregon's constitutional test for affirmance despite error consists of a single inquiry: Is there little likelihood that the particular error affected the verdict? The correct focus of the inquiry regarding affirmance despite error is on the possible influence of the error on the verdict rendered, not whether this court, sitting as a factfinder, would regard the evidence of guilt as substantial and compelling."

Again, the primary prejudice that defendant posits is that, in a case that turned on credibility—and, perhaps, circumstantial inferences as to mental state—the threatening statements could have been decisive. As a practical matter on this record, that proposition is hardly self-evident for at least two reasons.

The first, and more substantial, is the jury's disposition itself. As noted, three charges were submitted for the jury's consideration—second-degree assault (for "knowingly" causing physical injury to another (Kraynak) by means of a car); assaulting a public safety officer (for "knowingly" causing physical injury to Kraynak, *a person defendant knew to be a peace officer*," while Kraynak was acting as an officer); and first-degree criminal mischief (for *"intentionally"*

---

[10] We do not imply that subsequent statements are categorically inadmissible to prove a prior mental state. Rather, the dispositive consideration here is that defendant's threatening statements were unambiguous and exclusively referred to events occurring after the alleged criminal conduct.

[11] Article VII (Amended), section 3, provides, in part: "If the supreme court shall be of opinion, after consideration of all the matters thus submitted, that the judgment of the court appealed from was such as should have been rendered in the case, such judgment shall be affirmed, notwithstanding any error committed during the trial[.]"

causing property damage to Kraynak's police car). Again, the jury convicted on the first charge, but acquitted on the other two. The most (at least abstractly) plausible explanation of that verdict is that, (a) while jurors ultimately believed that defendant was culpably responsible for the injury-producing collision, (b) they accepted defendant's testimony that he did not know that the occupant of the other vehicle was a peace officer—or, at least, jurors concluded that the state had failed to prove that element of the peace officer assault charge, and (c) the jury also determined that the state had failed to prove that defendant acted "intentionally" for purposes of the criminal mischief charge.

If jurors had, in fact, relied on the improperly admitted statements as pertaining to defendant's purported contemporaneous mental state, or if jurors had been inflamed by the content of those statements, one might reasonably have expected that dynamic to have been manifested by way of convictions on either, or both, the peace officer assault charge and the criminal mischief charge (*i.e.*, defendant intentionally rammed Kraynak's car because he knew it was a police car, and he hated the police). But that did not occur. Instead, jurors convicted only on the one charge that required neither knowledge that the victim was a peace officer nor an intentional mental state.

A second circumstance also at least plausibly contradicts an inference that the erroneously admitted evidence may have materially skewed the jury's consideration and, particularly, its assessment of defendant's credibility: Jurors were aware that defendant had 17 prior felony convictions, including five convictions arising from separate episodes in which he had attempted to elude police officers.[12] Further, the court instructed jurors that they could consider those convictions for "their bearing, if any, on defendant's credibility." Given the number and diversity of defendant's properly admitted and properly considered felony convictions, the ultimate prejudicial impact of the erroneously admitted statements is, at least with respect to the jury's credibility assessment, questionable.

---

[12] Defendant, as a preemptive matter, acknowledged those convictions during his testimony on direct examination.

Nevertheless, we conclude that reversal is required. That is so because the erroneously admitted statements were both "qualitatively different than the evidence that the jury heard," *Davis*, 336 Or at 34, and were presented to the jury as bearing directly on the central issues in the case, *viz.*, defendant's contemporaneous mental state and his general credibility. *Compare Davis*, 336 Or at 32 (noting that erroneous admission of evidence would be harmless "if the particular issue to which the error pertains has no relationship to the jury's determination of its verdict"), *with State v. Perkins*, 221 Or App 136, 145, 188 P3d 482 (2008) (concluding that erroneous admission in DUII prosecution of coffee cup containing an alcoholic beverage, which was found in the defendant's pickup, was reversible error in that that evidence "went directly to the heart of [the state's] factual theory of the case" and, thus, was not harmless (internal quotation marks omitted; brackets in *Perkins*)). Indeed, as noted, 255 Or App at 519-20, the prosecutor highlighted the threatening statements in the state's rebuttal closing argument as being pivotal to the jury's assessment of defendant's contemporaneous mental state. *See Perkins*, 221 Or App at 145 (noting prosecutor's reference to the erroneously admitted evidence in closing argument).

To be sure, as noted, some aspects of the jury's verdict might belie ultimate prejudice. However, jury verdicts are inscrutable—and, in all events, the jury here *did* convict defendant of second-degree assault, with its requisite "knowing" culpable mental state. Given the manner in which the case was framed and the content of the erroneously admitted threatening statements, which served only to impugn defendant's character, we cannot say that there was "little likelihood" that that evidence affected the jury's verdict in that potentially dispositive regard.

Conviction for second-degree assault reversed and remanded; remanded for resentencing; otherwise affirmed.