Argued and submitted March 25, 2014, affirmed April 1, petition for review denied June 4, 2015 (357 Or 325)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

KEISHA ANITRA THOMAS,
aka Keisha Anitra Thomas-Medlock,
*Defendant-Appellant.*

Lane County Circuit Court
211201203; A151977

346 P3d 1279

Kyle Krohn, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Tiffany Keast, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Tookey, Judge.

HADLOCK, J.

## HADLOCK, J.

After a jury trial, defendant was convicted of driving under the influence of intoxicants (DUII), ORS 813.010, resisting arrest, ORS 162.315, interfering with a peace officer, ORS 162.247, harassment, ORS 166.065, and refusing an intoxicant test, ORS 813.095. The latter four convictions arose from defendant's interactions with Springfield police officer Burke after the officer told defendant that she was under arrest for DUII. At defendant's trial, another Springfield police officer, Douglas, testified about the events surrounding defendant's arrest; during that testimony, Douglas stated that he trusts Burke. On appeal, defendant argues that Douglas's statement was inadmissible "vouching" evidence and the trial court erred in admitting it. We conclude that any error was harmless and, therefore, affirm.

"[O]ne witness may not give an opinion on whether he or she believes another witness is telling the truth." *State v. Lupoli*, 348 Or 346, 357, 234 P3d 117 (2010). That principle requires courts to exclude a witness's statement "that he or she believes another witness, or that the other witness is honest or truthful," *id.*; the principle also requires courts to exclude less overtly vouching statements that are "tantamount to the same thing." *State v. Milbradt*, 305 Or 621, 630, 756 P2d 620 (1988). In this case, defendant contends that vouching occurred when Douglas testified as follows about defendant's conduct while Burke was searching her:

"[PROSECUTOR:] Okay. At some point during that search did you observe the defendant put her hands on Officer Burke's utility belt?

"[DOUGLAS:] I was concentrating on restraining her. I mean, she was flailing and—she had handcuffs on so her hands were behind her back, but, you know, I'm concentrating on holding her and restraining her against the car so Officer Burke can effectively search her.

"So I didn't necessarily see her put her hands on the belt, but I could hear Officer Burke yelling, 'Get your hands off of me.' And I trust Officer Burke, so."

Defendant objected at that point and asserted that Douglas was "vouching." The trial court overruled the objection.

Defendant's single assignment of error on appeal challenges that evidentiary ruling. In defendant's view, Douglas's statement that he trusted Burke was an impermissible comment on Burke's truthfulness. We need not address that argument, however, because we conclude that, even if the trial court erred in admitting Douglas's testimony, the error was harmless.

We "must affirm a judgment, despite any error committed at trial, if, after considering all the matters submitted, [we are] of the opinion that the judgment 'was such as should have been rendered in the case.'" *State v. Davis*, 336 Or 19, 28, 77 P3d 1111 (2003) (quoting Or Const, Art VII (Amended), § 3). That depends on "a single inquiry: Is there little likelihood that the particular error affected the verdict?" *Id.* at 32.

> "[A] variety of considerations may properly inform that 'single inquiry,' including 'the nature of the error that occurred below' and the 'context of the legal error.' [In *Davis*, t]he court noted, for example, that the erroneous exclusion or admission of evidence would be harmless 'if the particular issue to which the error pertains has no relationship to the jury's determination of its verdict' or if the jury 'would have regarded the * * * evidence as duplicative or unhelpful to its deliberations.'"

*State v. Perkins*, 221 Or App 136, 143, 188 P3d 482 (2008) (quoting *Davis*, 336 Or at 32, 33) (omission in *Perkins*; citations omitted). "[I]n our assessment of whether the erroneous admission of disputed evidence was harmless, we describe and review all pertinent portions of the record, not just those portions most favorable to the state." *State v. Maiden*, 222 Or App 9, 11, 191 P3d 803 (2008), *rev den*, 345 Or 618 (2009).

Defendant and the state presented conflicting accounts of defendant's contact with law-enforcement officers on the morning in question. Burke testified that, while he was on routine graveyard-shift patrol at about 2:30 a.m., he approached a minivan that was parked in a commercial parking lot to check on its occupants. (Burke also suspected that the minivan might be the same vehicle that he had seen a few minutes earlier speeding through

the parking lot.) Defendant and another person were in the van and, according to Burke, defendant said that she was "trying to sober up before [she went] anywhere." Defendant's statement was not the only indication that she had been drinking; Burke testified that defendant also had alcohol on her breath, had bloodshot and watery eyes, and fumbled in "trying to find [Burke's] hand" when he asked her for her license. Burke testified that he told defendant not to drive, and he left.

In her own testimony, defendant disputed some aspects of Burke's description of events to that point. Defendant acknowledged that she spoke with Burke while she was parked in the parking lot, but testified that she had drunk only "a couple glasses of wine" before 10:00 or 10:15 p.m. She testified that Burke had not requested her drivers' license, and she denied that Burke had told her not to drive before he left. The passenger in defendant's van (Aldrede) testified similarly that Burke had simply asked her and defendant whether everything was okay and then left.

Burke testified that, because he was concerned that defendant might drive, he remained in the area. A few minutes later, he realized that the minivan was no longer in the parking lot. Burke obtained defendant's home address from dispatch and drove to that location, which was several blocks away. The minivan was in defendant's driveway. As Burke approached the house on foot, defendant jumped out of the minivan's driver-side door. Burke told defendant to get back into the van, and she did. Burke then told defendant that he "was there because [he] believed she had driven home impaired."

Burke testified that defendant became angry, denied that she had been drinking *or* driving, yelled and swore at him, and was "flailing her arms" and "swinging her hands about." Defendant "was adamant she hadn't driven" and declared that she had been home all night. After defendant refused to perform field sobriety tests, Burke recited her *Miranda* rights and defendant indicated that she understood them. Because defendant had refused to perform field sobriety tests, Burke read her the *Rohrs* admonishment

and demonstrated some physical field sobriety tests for her.[1] According to Burke, defendant did not listen to the admonishment or watch him perform the tests, but "continued to yell and scream various vulgarities and profanities." When Burke asked defendant again whether she would perform the tests, she again declined. Burke then told defendant that she was under arrest for DUII.

Shortly before Burke asked defendant whether she would perform field sobriety tests, Douglas, who had been dispatched to assist Burke, arrived at defendant's home. Douglas's testimony regarding defendant's behavior mirrored Burke's. Douglas described defendant as "completely uncooperative and belligerent." According to Douglas, defendant "was kind of flailing around in her seat" during the entire encounter and yelling over Burke as he tried to question her. Even a few feet away from defendant, Douglas could smell "an overwhelming odor of alcohol beverage * * * coming from within the car" and he believed that "she was definitely intoxicated."

Burke and Douglas both testified that defendant refused to get out of her van after Burke told her that she was under arrest for DUII. After Burke said "that she could get out of the car under her own power or [Burke] could take her out of the car" and defendant still refused, Burke grabbed defendant's wrist in an effort to bring her out of the car, but he was unsuccessful, as defendant continued to pull away. Burke then tried to use a "hair hold," not realizing that defendant was wearing a wig, and the wig came off in his hand.[2] He dropped the wig, grabbed defendant's hair, and pulled her out of the van. Defendant, now standing outside of the van, continued to pull away as Burke tried to handcuff her and told her to stop resisting. Douglas testified that he and Burke "weren't able to control [defendant]

---

[1] The *Rohrs* admonishment, which is based on our holding in *State v. Rohrs*, 157 Or App 494, 499, 970 P2d 262 (1998), *aff'd*, 333 Or 397, 40 P3d 505 (2002), is "a warning that refusal to submit to physical [field sobriety] tests [can] be used against [a] defendant in court." *State v. Koch*, 267 Or App 322, 324, 341 P3d 112 (2014).

[2] Burke described a "hair hold" as a technique that "distracts the attention of the person who we're grabbing and focuses their attention on their head, * * * while causing very minimal pain [and] no damage or injury."

in any way" as she was "clenching her fists and throwing her body weight around." Eventually, Burke and Douglas "escorted [defendant] to the ground" (both of them went to the ground also) where her body movement would be more limited. Burke testified that defendant continued to kick, that she hit Burke "a couple of times with her clenched fists," and that "it took both [Burke and Douglas] to bring her arms behind her back" so she could be handcuffed.

That altercation occurred in a confined area near a rose bush "between [defendant's] house and her van." At that point, defendant "was on the ground yelling for help." Burke testified that he had told defendant repeatedly to stand up, but she had refused and gone limp, telling the officers, "Stand me up, then." The officers lifted defendant, who refused to move toward the patrol car, and they carried her over a rose bush that was about waist high because that was the quickest route to the patrol car. Burke testified that he and Douglas could not have carried defendant around the rose bush without contacting it, given the confined space in which the altercation occurred. Burke testified that the rose bush scratched defendant's legs and his own thighs and hands.

When the officers and defendant arrived at Burke's patrol car, Burke searched defendant while Douglas restrained her. Burke testified that defendant was grabbing at "anything she can grab on my belt"; at one point, she had her hand on his gun. As set out above, Douglas testified that he did not see defendant touch Burke's belt, but he heard Burke yell, "Get your hands off me." Defendant continued to be belligerent and Douglas eventually "had to place [her] head against the back of the trunk of [Burke's] car in order to gain compliance from her."

Burke and Douglas testified that defendant refused to get inside the car and continued to yell and scream for help. Douglas eventually pulled defendant into the back seat of the patrol car from the opposite side. Burke then drove to the Springfield Jail. During the drive, Burke testified, defendant threatened to sue Burke. Defendant accused Burke of having "followed her from the bar" only because of her race, but then insisted that she had been home all night.

Defendant's passenger, Aldrede, described the events at defendant's house differently. She acknowledged that defendant had driven to her house after they spoke to Burke in the parking lot and said that nothing made her feel that defendant was unsafe to drive. She said that Burke arrived at the house about 10 minutes after she and defendant arrived, came up to defendant's window, and said he was arresting her for DUII. Aldrede testified that Burke and defendant "were being very nice to each other" and then things suddenly "got out of control":

> "He grabbed her out of the car. Threw her—pulled her wig off. Threw it on the floor. And then took her out. And then he just—everything just happened so fast. He jumped on top of her and she was screaming for help."

Aldrede testified that she did not hear Burke ask defendant to get out of the van before he pulled her out. Aldrede testified that defendant did not "do anything" and did not "have time to do anything" because she was on the ground right away. Aldrede said that she never heard defendant use vulgar language or hit the officers. She also testified that she did not feel that defendant was under the influence of alcohol that night, although defendant had around three or four drinks earlier that evening. Aldrede acknowledged that she had drunk around six beers herself that evening, enough that she was feeling ill.

Defendant testified that Burke did not give her time to get out of the van herself before he opened the door and pulled her out. Defendant testified that Burke "took [her] down," and that he then dragged her through a rose bush to the patrol car. Defendant denied that she tried to pull away from Burke. She also denied that she struggled with Burke when he put her in the car. Moreover, defendant testified, she did not recall Douglas at all, and had never seen him.

Witnesses also gave diverging testimony about subsequent events at the Springfield Jail. A female detention officer, Akins, testified that she spoke with defendant while she was still in the back of Burke's patrol car and was able to calm her down. Defendant then got out of the car on her own. Akins and Burke both testified that they then escorted defendant toward the area where an Intoxilyzer machine is located and, on the

way, defendant started yelling again and kicked Burke's leg. Akins responded by grabbing defendant and pushing her against a wall to try to gain compliance. Defendant resisted and did not follow verbal instructions. At that point, Akins testified, she felt that she and Burke "were not able to physically get control of [defendant] so it would be safe for her and safe for [the officers], and so [Akins] said [they] needed to take her down to the ground," which they did.

By contrast, defendant testified that she did not kick Burke. Defendant explained that she was only trying to put on one of her shoes when Akins threw her against the wall and then Akins and Burke took her down to the ground.

Akins testified that, after defendant became more compliant, the officers stood her back up and took her to a holding cell. Akins instructed defendant to remain seated on a bench in the cell and, when defendant did not comply, put a hand on her shoulder. Defendant then kicked Akins twice. Burke and Akins testified that Burke read defendant the implied consent form, but defendant continued to scream and yell, and she refused to take a breath test. Akins testified that it was her opinion that defendant was "very much under the influence of alcohol."

Because the Springfield Jail does not house women, defendant had to be transported to the Lane County Jail once it became clear that she was not going to take the breath test. When Akins reentered the holding cell, defendant's pants "were down at her ankles" and she appeared to be trying to "take her pants off further by using her feet to push against the pants," which had become dirty. Akins twice offered to help her put her pants back on, but defendant refused. Burke, who heard female officers, including Akins, offer to help defendant with her pants, testified that defendant said "in numerous and profane ways that she was not going to let them."

Defendant denied that she pulled her pants off; she said they fell because they "had been shredded going through the rose bushes." She testified that she had asked for new pants, but that no one brought her any. Defendant

testified that a combination of two factors led to her not taking the breath test: that she had no pants to wear and that the officers refused to let her take the test, in that they pushed her back down when she got up to take it.

Burke and Akins both testified that defendant began spitting at some point, and Burke put a spit hood on her. Because defendant's pants were still off, female officers escorted defendant out of the holding cell and directed her back to Burke's patrol car, which she refused to enter, despite multiple requests from Akins. Officers had to physically push and pull defendant to get her back into the car. At trial, defendant denied that she spat at any of the officers and denied that she was intoxicated or resisted arrest at any time during the evening.

The state also introduced a series of still photographs from a camera system at the Springfield Jail. When the images are viewed in succession, they create a movie-like, although very choppy, recording of defendant's interactions with the officers at the jail, that do not capture every detail.[3] The photographs did not capture defendant kicking Burke, although they did capture Akins and Burke moving defendant to the wall and then to the ground.

In closing argument, the prosecutor explained that the state's theory was that defendant committed the crime of interfering with a police officer when she disobeyed Burke's order to get out of her vehicle after he told her that she was under arrest. The relevant conduct for the harassment charge was that defendant had kicked Burke at the jail. The jury found defendant guilty of DUII, resisting arrest, interfering with a police officer, and harassment, and the trial court found her guilty of refusing an intoxicant test.

On appeal, in support of her contention that the court's admission of Douglas's testimony likely affected the verdict, defendant asserts that the case was a credibility contest: "the jury's verdict depended upon whether they

---

[3] The parties disputed how often the camera system takes a photograph. Akins testified that it takes a photograph approximately every other second, but defendant pointed out that, according to the times marked on the photographs, it takes a photograph every second.

believed the police officer witnesses or defendant and her companion."[4] Burke's testimony was particularly important, according to defendant, because he witnessed all of defendant's conduct and made the initial decision to arrest her. Finally, defendant contends, "Douglas' vouching for Burke likely affected the jury's assessment of Burke's credibility." Thus, in defendant's view, Douglas's statement that he trusted Burke is likely to have affected the verdict.

The nature and context of the purported error here demonstrate that Douglas's statement would not have affected the jury's assessment of Burke's credibility to defendant's detriment. We consider the effect of the challenged testimony as to all five charges together because that is the way in which the parties tried the case. Both the state and defendant argued that the jury was faced with a choice between believing defendant's version of events (or something approaching it), and acquitting defendant of all charges, or believing the three officers' version of events, and convicting defendant of all charges.

Thus, in order to accept defendant's theory of the case, the jury would have had to disbelieve all three officers' testimony that defendant was intoxicated and belligerent as a result of being intoxicated. To that end, in closing argument, defendant tried to persuade the jury that Douglas and Akins did not independently conclude that defendant was intoxicated; rather, defendant argued, they simply accepted Burke's conclusion that defendant was intoxicated. Defendant also argued that Burke and Douglas had discussed their testimony before trial and made sure that their versions of events lined up. Finally, defendant contended that Burke did not believe that defendant was intoxicated when he first saw her (if he had, defendant argued, Burke would have arrested defendant in the parking lot rather than waiting for her to drive home) and that Burke's mischaracterization—and, by inference, the other officers' mischaracterization—of her conduct was the result of her threat to sue Burke.

---

[4] As noted above, the trial court sat as fact finder on the charge of refusal of an intoxicant test. Throughout our analysis, our references to the jury also refer to the trial court sitting as fact finder.

Given the way in which defendant argued her case—pinning her defense on a theory that the officers had cooperated in mischaracterizing defendant's actions on the night of her arrest—it is highly unlikely that Douglas's testimony that he trusted Burke would have buoyed Burke's credibility. The testimony of the three officers depicted defendant's conduct the same way; all three agreed that defendant had been very intoxicated and belligerent as a result. Defendant asked the jury to believe that the officers had mischaracterized defendant's conduct and that they had done so in concert. Thus, either all three officers were truthful, or all three were lying to protect themselves and each other. In that context, the testimony of one possibly lying officer that he trusted another possibly lying officer would not buoy the credibility of the officers' story.

In fact, Douglas's statement that he trusted Burke is more likely to have bolstered defendant's theory of the case. As we have explained, defendant contended that only Burke had independently assessed whether defendant was intoxicated; in defendant's view, Douglas and Akins had accepted Burke's opinion rather than independently assessing defendant's condition. Specifically, as to Douglas, defense counsel argued:

"You heard Officer [Douglas]. I got radioed out to a DUI. I know what that means. Driver under the influence of intoxicants. You heard it.

"Officer Burke's a good officer. He wouldn't make a mistake like that. So [Douglas] has already made up his mind. He hasn't even gotten there."

Thus, Douglas's statement that he trusted Burke was harmless because it suggested that Douglas might accept Burke's conclusion that defendant was intoxicated without evaluating it for himself—exactly the point that defendant tried to make to the jury. Rather than making the jury believe that Burke was telling the truth, Douglas's statement was likely to make the jury believe that Douglas would back up Burke's version of events. That was what defendant wanted. Accordingly, there is little likelihood that any error in admitting Douglas's statement affected the verdict.

Affirmed.